FEDERAL TRADE COMMISSION *v.* FRED
MEYER, INC., ET AL.

No. 27.   Argued November 6, 1967.—Decided March 18, 1968.

342

*Daniel M. Friedman* argued the cause for petitioner. On the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Francis X. Beytagh, Jr., James McI. Henderson* and *E. K. Elkins.*

*Edward F. Howrey* argued the cause for respondents. With him on the brief were *Terrence C. Sheehy* and *George W. Mead.*

*Morris B. Abram* filed a brief for the Atlantic Coast Independent Distributors Association, Inc., as *amicus curiae,* urging reversal.

*Gilbert H. Weil* filed a brief for Clairol Incorporated, as *amicus curiae,* urging affirmance.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The Federal Trade Commission, after extensive proceedings, ruled that respondents, the corporate owner of a chain of supermarkets and two of its officers, had unlawfully induced certain suppliers to engage in discriminatory pricing and sales promotional activities prohibited by §§ 2 (a) and 2 (d) of the Clayton Act, as amended

by the Robinson-Patman Act.[1]  63 F. T. C. —— (1963). The Court of Appeals for the Ninth Circuit disagreed with the Commission's construction of § 2 (d) and reversed in part its ruling that the section had been violated.  359 F. 2d 351 (1966).  We granted certiorari, 386 U. S. 907 (1967), because the case presents important questions concerning the scope of a key provision of the Robinson-Patman Act.

## I.

Section 2 (d) makes it unlawful for a supplier in interstate commerce to grant advertising or other sales promotional allowances to one "customer" who resells the supplier's "products or commodities" unless the allowances are "available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." [2]  Although we have limited our review of this case to one aspect of the alleged § 2 (d)

---

[1] 38 Stat. 730, as amended, 49 Stat. 1526, 1527, 15 U. S. C. §§ 13 (a), 13 (d).  Section 2 (a) provides in pertinent part:

"[I]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be . . . to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . ."

Section 2 (d) provides in full:

"[I]t shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

[2] See n. 1, *supra*.

violations,[3] full understanding of the issues requires a brief exposition of the facts from which the Commission concluded that respondents had induced violations of both §§ 2 (a) and 2 (d). The relevant facts found by the Commission were not disturbed by the Court of Appeals.

Respondent Fred Meyer, Inc., operates a chain of 13 supermarkets in the Portland, Oregon, area which engage in the retail sale of groceries, drugs, variety items, and a limited line of clothing. In 1957 Meyer's sales exceeded $40,000,000. According to its 1960 prospectus, it made one-fourth of the retail food sales in the Portland area and was the second largest seller of all goods in that area. Since 1936 Meyer has conducted annually a four-week promotional campaign in its stores based on the distribution of coupon books to consumers. The books usually contain 72 pages, each page featuring a single product being sold by Meyer at a reduced price. The consumer buys the book for the nominal sum of 10¢ and must surrender the appropriate coupon when making his purchase of goods. A coupon often represents a reduc-

---

[3] The Commission and respondents filed separate petitions for certiorari to review different rulings of the Court of Appeals. Respondents contended (1) that the Commission had failed to show that respondents' inducement of §§ 2 (a) and 2 (d) violations had been knowing and (2) that the Commission's order prohibiting future inducement of § 2 (d) violations was too broad. The Commission's petition raised the question "[w]hether a supplier's granting to a retailer who buys directly from it promotional allowances that are not made available to a wholesaler who resells to retailers competing with the direct-buying retailer violates Section 2 (d) of the Robinson-Patman Act." The Commission also presented an additional question which it sought to reserve only if respondents' petition were granted. We denied respondents' petition, 386 U. S. 908 (1967), and specifically limited our review on the Commission's petition to the issue of statutory interpretation therein presented. 386 U. S. 907 (1967).

tion of one-third or more from Meyer's regular price for the featured item, and the cover of the 1957 book stated that the use of all 72 coupons would result in total savings of more than $54. The promotional campaign is highly successful. Meyer sold 138,700 books in 1957 and 121,270 in 1958. Aside from the nominal 10¢ paid by consumers for the coupon books, Meyer finances the promotion by charging the supplier of each featured product a fee of at least $350 for each coupon-page advertising his product.[4] Some participating suppliers further underwrite the promotion by giving Meyer price reductions on its purchases of featured items, by replacing at no cost a percentage of the goods sold by Meyer during the campaign, or by redeeming coupons in cash at an agreed rate.

The Commission concluded that this promotional scheme, as conducted in the years 1956 through 1958, violated §§ 2 (d) and 2 (a) in the following respects: First, the $350 paid to Meyer by each of four suppliers participating in the campaigns represented promotional allowances paid in violation of § 2 (d) because similar allowances were not made available on proportionally equal terms to competing customers. Second, the additional value given Meyer by these suppliers in the form of discounts, free replacements of goods sold and coupon redemptions amounted to price discrimination prohibited by § 2 (a).[5] The Commission held that by inducing the suppliers to discriminate in price, respondents had vio-

---

[4] The Commission found that the total of $25,200 received by Meyer from 72 participating suppliers in each of the years 1956 and 1957 more than covered Meyer's cost of publishing, distributing, and publicizing the coupon books in those years. The Commission characterized as "clear profit" the $13,870 paid Meyer by consumer purchasers of the books in 1957.

[5] See n. 1, supra.

lated § 2 (f) of the Act,[6] and that by inducing them to grant discriminatory promotional allowances, respondents had engaged in an unfair method of competition in violation of § 5 (a) of the Federal Trade Commission Act.[7]

Both before the Commission and in the Court of Appeals, respondents argued that it was not established that two participating suppliers, Tri-Valley Packing Association and Idaho Canning Company, had violated § 2 (d). Meyer purchased directly from both of these suppliers. Tri-Valley participated in the 1957 promotion by paying Meyer $350 for a coupon-page featuring Tri-Valley's brand of canned peaches and by replacing in merchandise every third can sold by Meyer on the coupon's offer of three cans for the price of two. Idaho Canning participated in the 1957 promotion on substantially identical terms, except that the coupon-page it purchased offered three cans of corn for the price of two. The Commission found that two wholesalers, Hudson House and Wadhams & Co., both of which resold to Meyer's retail competitors, had been disfavored in these transactions in that Hudson House had purchased canned peaches from Tri-Valley and both Hudson House and Wadhams had purchased canned corn from Idaho Can-

---

[6] 15 U. S. C. § 13 (f):

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."

[7] 38 Stat. 719, as amended, 66 Stat. 632, 15 U. S. C. § 45 (a):

"(1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful.

.        .        .        .        .

"(6) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

ning, but neither of the two wholesalers had been accorded promotional allowances comparable to those received by Meyer. Respondents argued that, purely as a matter of statutory construction, Tri-Valley and Idaho Canning could not have violated the requirement of proportional equality among "customers competing in the distribution" of their products because (1) Meyer, a retailer, was not "competing" in the distribution of canned corn and peaches with the disfavored wholesalers, Hudson House and Wadhams, and (2) the retailers found by the Commission to be competing with Meyer in the resale of these products were not "customers" of Tri-Valley and Idaho Canning but were customers of Hudson House and Wadhams.

The Commission rejected this reading of § 2 (d), noting that, if respondents' view prevailed, a retailer buying from a wholesaler and having no direct dealings with his supplier would receive no protection against discriminatory promotional allowances given his competitor who purchased directly from the supplier. The Commission held that § 2 (d) prohibits a supplier from granting promotional allowances to a direct-buying retailer, such as Meyer, unless the allowances are also made available to wholesalers who purchase from the supplier and resell to the direct-buying retailer's competitors. Accordingly, the Commission's cease-and-desist order included a provision barring respondents from inducing suppliers to grant them promotional allowances not available to "customers who resell to purchasers who compete with respondents in the resale of such supplier's products." 63 F. T. C., at ——. One Commissioner, while agreeing with the majority that respondents had induced Tri-Valley and Idaho Canning to violate § 2 (d), dissented in part on the ground that the order should have required the promotional allowances to be made available to the retailers competing with Meyer rather than to

wholesalers who resold to them.[8]   Thus, in his view, the competing retailers were "customers" of Tri-Valley and Idaho Canning within the meaning of the statute.   The Court of Appeals adopted the interpretation of § 2 (d) urged by respondents.   Consequently, it set aside the portion of the Commission's order set out above.

We agree with the Commission that the proscription of § 2 (d) reaches the kind of discriminatory promotional allowances granted Meyer by Tri-Valley and Idaho Canning.   Therefore, we reverse the judgment of the Court of Appeals on this point.   However, because we have concluded that Meyer's retail competitors, rather than the two wholesalers, were competing customers under the statute, we also remand the case for appropriate modification of the Commission's order.   We deal first with respondents' arguments, second with the opinion of the Court of Appeals, and third with the Commission's order.

## II.

Respondents press upon us a view of § 2 (d) which leaves retailers who buy from wholesalers for the most part unprotected from discriminatory promotional allowances granted their direct-buying competitors.   We are told that § 2 (d) in specific terms requires this result. To benefit from the statute's requirement of proportional equality, it is urged, a buyer must be a "competing customer" within the narrowest sense of that phrase.   Thus, the wholesalers in this case are not competing customers because they do not compete with Meyer, and the retailers who do compete with Meyer in the resale of the suppliers' products are outside the protection of § 2 (d) because they are not customers of the suppliers.   For reasons stated below, we agree with respondents that, on

---

[8] 63 F. T. C., at —— (Commissioner Elman, concurring in part and dissenting in part).

the facts of this case, § 2 (d) reaches only discrimination between customers competing for resales at the same functional level and, therefore, does not mandate proportional equality between Meyer and the two wholesalers.[9] But we cannot accept the second half of this argument, for it rests on a narrow definition of "customer" which becomes wholly untenable when viewed in light of the central purpose of § 2 (d) and the economic realities with which its framers were concerned.

Conceding that the Robinson-Patman amendments by no means represent an exemplar of legislative clarity,[10] we cannot, in the absence of an unmistakable directive, construe the Act in a manner which runs counter to the broad goals which Congress intended it to effectuate. See, *e. g.*, *FTC* v. *Sun Oil Co.*, 371 U. S. 505, 516–521 (1963); *Elizabeth Arden Sales Corp.* v. *Gus Blass Co.*, 150 F. 2d 988, 991–993 (C. A. 8th Cir.), cert. denied, 326 U. S. 773 (1945). We start with the proposition that "[t]he Robinson-Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *FTC* v. *Henry Broch & Co.*, 363 U. S. 166, 168 (1960). The role within the statutory scheme which Congress intended for § 2 (d) is well documented in the legislative history. An investigation of chain store buying practices undertaken by the Federal Trade Commission, at Congress' request,[11] had

---

[9] This case, in its present posture, does not present the question whether the functional label used by a manufacturer or reseller reflects his actual position in the distributive chain. Compare *FTC* v. *Ruberoid Co.*, 343 U. S. 470, 475 (1952); cf. *FTC* v. *Simplicity Pattern Co.*, 360 U. S. 55, 62–63 (1959).

[10] *Automatic Canteen Co.* v. *FTC*, 346 U. S. 61, 65 (1953); see F. Rowe, Price Discrimination Under the Robinson-Patman Act 20 (1962).

[11] S. Res. No. 224, 70th Cong., 1st Sess., 69 Cong. Rec. 7857 (1928).

indicated that § 2 of the Clayton Act was an inadequate deterrent against outright price discrimination.[12] The investigation also revealed that certain practices by which large buyers induced concessions which their smaller competitors could not obtain were wholly beyond the reach of § 2.[13] It is significant that congressional concern had focused on the buying practices of large retailers, particularly the chain stores, because it was felt that they were threatening the continued existence of the independent merchant.[14] Indeed, before Congress acted, some States had attempted to limit the growth of retail chains through express prohibitions against further extensions and through taxation.[15] One of the practices disclosed by the Commission's investigation was that by which large retailers induced con-

---

[12] Federal Trade Commission, Final Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess., 63–65, 90–91, 96–97 (1935).

[13] *Id.*, at 57–65. See also Hearings before the Special House Committee on Investigation of American Retail Federation, 74th Cong., 1st Sess. (1935).

[14] See C. Austin, Price Discrimination and Related Problems under the Robinson-Patman Act 6–11 (2d rev. ed. 1959). In presenting his bill to the House Judiciary Committee, Representative Patman stated:

"I believe it is the opinion of everyone who has studied this subject, that the day of the independent merchant is gone unless something is done and done quickly. He cannot possibly survive under that system. So we have reached the crossroads; we must either turn the food and grocery business of this . . . country over to a few corporate chains, or we have got to pass laws that will give the people, who built this country in time of peace and who saved it in time of war, an opportunity to exist—not to give them any special rights, special privileges, or special benefits, but just to deny their competitors the special benefits that they are getting, that they should not be permitted to have." Hearings on H. R. 8442, 4995, and 5062 before the House Committee on the Judiciary, 74th Cong., 1st Sess., 5–6 (1935).

[15] See Federal Trade Commission, Final Report on the Chain-Store Investigation, *supra,* n. 12, at 78–82.

cessions from suppliers in the form of advertising and other sales promotional allowances.[16] The draftsman of the provision which eventually emerged as § 2 (d) explained that, even when such payments were made for actual sales promotional services, they were a form of indirect price discrimination because the recipient of the allowances could shift part of his advertising costs to his supplier while his disfavored competitor could not.[17] That Congress adopted this view of the practice it sought to eliminate by § 2 (d) is demonstrated by the words used by the Senate Judiciary Committee in recommending enactment of the section:

> "Still another favored medium for the granting of oppressive discriminations is found in the practice of large buyer customers to demand, and of their sellers to grant, special allowances in purported payment of advertising and other sales promotional services, which the customer agrees to render with reference to the seller's products, or sometimes with reference to his business generally. Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, or when in any case the customer is deriving from it equal benefit to his own business and is thus enabled to shift to his vendor substantial portions of his own advertising cost, while his smaller competitor, unable to command such allowances, cannot do so." [18]

---

[16] *Id.*, at 44–46, 61. See also Hearings before the Special House Committee on Investigation of American Retail Federation, 74th Cong., 1st Sess., Vol. 3, No. 1, at 66–88 (1935).

[17] Hearings on Bills to Amend the Clayton Act before a Subcommittee of the House Committee on the Judiciary, 74th Cong., 2d Sess., 464 (1936) (Mr. Teegarden).

[18] S. Rep. No. 1502, 74th Cong., 2d Sess., 7 (1936). The House Judiciary Committee reported the provision favorably in identical terms. H. R. Rep. No. 2287, 74th Cong., 2d Sess., 15–16 (1936).

Congress chose to deter such indirect price discrimination by prohibiting the granting of sales promotional allowances to one customer unless accorded on proportionally equal terms to all competing customers.

Of course, neither the Committee Report nor other parts of the legislative history in so many words define "customer" to include retailers who purchase through wholesalers and compete with direct buyers in resales. But a narrower reading of § 2 (d) would lead to the following anomalous result. On the one hand, direct-buying retailers like Meyer, who resell large quantities of their suppliers' products and therefore find it feasible to undertake the traditional wholesaling functions for themselves, would be protected by the provision from the granting of discriminatory promotional allowances to their direct-buying competitors. On the other hand, smaller retailers whose only access to suppliers is through independent wholesalers would not be entitled to this protection. Such a result would be diametrically opposed to Congress' clearly stated intent to improve the competitive position of small retailers by eliminating what was regarded as an abusive form of discrimination. If we were to read "customer" as excluding retailers who buy through wholesalers and compete with direct buyers, we would frustrate the purpose of § 2 (d). We effectuate it by holding that the section includes such competing retailers within the protected class.

### III.

The Commission did not press in the Court of Appeals the position of one Commissioner that retailers who purchased through Hudson House and Wadhams and competed with Meyer in resales were customers of Tri-Valley and Idaho Canning. Consequently, that court gave almost no consideration to the construction of § 2 (d) which we hold to be the proper one. Citing its prior

ruling in *Tri-Valley Packing Assn.* v. *FTC,* 329 F. 2d
694, 709–710 (C. A. 9th Cir. 1964), the court merely
stated that a § 2 (d) violation could not be made out
unless (1) Tri-Valley and Idaho Canning had in some
way dealt directly with retailers competing with Meyer,
and (2) canned peaches and corn sold by the two sup-
pliers could be traced through Hudson House and Wad-
hams to the shelves of the competing retailers. 359 F.
2d, at 359–360, 362–363. In the view of the Court of
Appeals, these two requirements compose the elements
of the "indirect customer" doctrine under which the
Commission and the courts impose § 2 (d) liability when
a supplier in effect supplants his intermediate distribu-
tors in dealings with those to whom the distributors resell
and favors some of the distributors' accounts over others.
See *American News Co.* v. *FTC,* 300 F. 2d 104, 109 (C. A.
2d Cir.), cert. denied, 371 U. S. 824 (1962); *K. S. Corp.*
v. *Chemstrand Corp.,* 198 F. Supp. 310, 312–313 (D. C.
S. D. N. Y. 1961); *Kay Windsor Frocks, Inc.,* 51 F. T. C.
89, 95–96 (1954); F. Rowe, Price Discrimination Under
the Robinson-Patman Act 398–399 (1962), 90 (1964
Supp.). We need not and do not question the validity
of this doctrine as applied to pierce a supplier's unreal-
istic claim that a reseller favored by him is actually the
customer of an intermediate distributor. Nor do we
reach the question whether a retailer may succeed in a
private action based on §·2 (d) without proving that
he in fact resold the supplier's product in competition
with a favored buyer. In the case before us, it is con-
ceded that Meyer was a customer of Tri-Valley and
Idaho Canning. Moreover, as indicated by its approval
of the Commission's § 2 (a) ruling, the Court of Appeals
did not question the Commission's finding that Meyer
competed in the resale of Tri-Valley and Idaho Canning
products with retailers who purchased through Hudson

House and Wadhams.[19]   Given these findings, it was
unnecessary for the Commission to resort to the indirect
customer doctrine.   Whether suppliers deal directly with
disfavored competitors or not, they can, and here did,
afford a direct buyer the kind of competitive advantage
which § 2 (d) was intended to eliminate.   In light of
our holding that "customers" in § 2 (d) includes retailers
who buy through wholesalers and compete with a direct
buyer in the resale of the supplier's product, the require-
ment of direct dealing between the supplier and dis-
favored competitors imposed by the Court of Appeals
rests on too narrow a reading of the statute.   Further,
in light of the Commission's finding that Meyer com-
peted in the resale of the Idaho Canning and Tri-Valley
products with other retailers in the area who purchased
through Hudson House and Wadhams and in light of
the fact that the Court of Appeals did not disturb this
finding, the court misapprehended the Commission's bur-
den in requiring it to trace those products to the shelves
of the disfavored retailers.

## IV.

The Commission's view of the impact of respondents'
argument in no way conflicts with our own.   In rejecting
respondents' construction of § 2 (d), the Commission
observed:

> "The net result of this argument is that the entire
> structure of 'independent' food merchants—including
> the traditional wholesaler and his numerous, small
> retailer-customers—are placed completely outside

---

[19] The Commission's § 2 (a) and § 2 (d) rulings were both based
on findings that retailers in the Portland area who purchased through
Hudson House and Wadhams competed with Meyer in the resale
of Idaho Canning corn and Tri-Valley peaches.   The Court of Ap-
peals could not have consistently set aside these findings with regard
to the § 2 (d) violations while upholding them with respect to § 2 (a).

the pale of Section 2 (d) of the amended Clayton Act insofar as their competition with the direct-buying 'chains' is concerned.

.          .          .          .          .

"We are not persuaded that Congress either intended or effected any such result when it passed Section 2 (d). In the first place, such a construction goes squarely against the well-known purposes of the Act itself, namely, to give the 'independent' food sellers an even break in their competition with the 'chains.' " [20]

But rather than concluding, as we have, that retailers who purchased through Hudson House and Wadhams and competed with Meyer in resales were disfavored customers of Tri-Valley and Idaho Canning, a majority of the Commission held that the wholesalers, Hudson House and Wadhams, were the customers entitled to promotional allowances on proportionally equal terms with Meyer. Although we approach the Commission's ruling with the deference due the agency charged with day-to-day administration of the Act, we hold that, at least on the facts before us, § 2 (d) does not require proportional equality between Meyer and the two wholesalers.

The Commission believed it found support for its position in the language of § 2 (d) itself, which requires that promotional allowances be accorded on proportionally equal terms to "customers competing in the *distribution*" of a supplier's product, rather than merely to customers competing in resales. The majority reasoned that Hudson House and Wadhams, when they resold to Meyer's retail competitors, were competing with Meyer in the distribution of Tri-Valley and Idaho Canning products because the two wholesalers were "seeking exactly the same consumer dollars that respond-

---

[20] 63 F. T. C., at ——.

ents are after." 63 F. T. C., at ——. While it cannot be doubted that Congress reasonably could have employed such a broad concept of competition in § 2 (d), we do not believe that the use of the word "distribution" rather than "resale" is a clear indication that it did, and what discussion there was of the promotional allowance provision during the congressional hearings indicates that the section was meant to impose proportional equality only where buyers competed on the same functional level. Thus, in reporting the provision, both the Senate and House Judiciary Committees used the following example:

> "To illustrate: Where, as was revealed in the hearings earlier referred to in this report, a manufacturer grants a particular chain distributor an advertising allowance of a stated amount per month per store in which the former's goods are sold, a competing customer with a smaller number of stores, but equally able to furnish the same service per store, and under conditions of the same value to the seller, would be entitled to a similar allowance on that basis." [21]

This illustration and others which could be cited are not conclusive, but they do strongly suggest that the competition with which Congress was concerned in § 2 (d) was that between buyers who competed in resales of the supplier's products. And, as stated above, Congress' objective was to assure that all sellers, regardless of size, competing directly for the same customers would receive even-handed treatment from their suppliers.[22] We noted in *FTC* v. *Sun Oil Co.*, 371 U. S. 505 (1963), that when Congress wished to expand the meaning of competition to include more than resellers

---

[21] S. Rep. No. 1502, 74th Cong., 2d Sess., 8 (1936); H. R. Rep. No. 2287, 74th Cong., 2d Sess., 16 (1936).

[22] See n. 14, *supra*.

operating on the same functional level, it knew how to do so in unmistakable terms. It did so in § 2 (a) of the Act by prohibiting price discrimination which may "injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." *Id.*, at 514–515; see *FTC* v. *Morton Salt Co.*, 334 U. S. 37, 55 (1948). We stated in *Sun Oil* that:

> "There is no reason appearing on the face of the statute to assume that Congress intended to invoke by omission in § 2 (b) the same broad meaning of competition or competitor which it explicitly provided by inclusion in § 2 (a); the reasonable inference is quite the contrary."[23]

In the present case, too, we think "the reasonable inference" is that Congress did not intend such a broad meaning of competition in § 2 (d). We recognize that it would be both inappropriate and unwise to attempt to formulate an all-embracing rule applying the elusive language of the section to every system of distribution a supplier might devise for getting his product to the consumer. But, on the concrete facts here presented, it is clear that the direct impact of Meyer's receiving discriminatory promotional allowances is felt by the disfavored retailers with whom Meyer competes in resales. We cannot assume without a clear indication from Congress that § 2 (d) was intended to compel the supplier to pay the allowances to a reseller further up the distributive chain who might or might not pass them on to the level where the impact would be felt directly. We conclude that the most reasonable construction of § 2 (d) is one which places on the supplier the responsibility for making promotional allowances available to those resellers who compete directly with the favored buyer.

---

[23] 371 U. S., at 515.

The Commission argues here that the view we take of § 2 (d) is impracticable because suppliers will not always find it feasible to bypass their wholesalers and grant promotional allowances directly to their numerous retail outlets. Our decision does not necessitate such bypassing. We hold only that, when a supplier gives allowances to a direct-buying retailer, he must also make them available on comparable terms to those who buy his products through wholesalers and compete with the direct buyer in resales. Nothing we have said bars a supplier, consistently with other provisions of the anti-trust laws, from utilizing his wholesalers to distribute payments or administer a promotional program, so long as the supplier takes responsibility, under rules and guides promulgated by the Commission for the regulation of such practices,[24] for seeing that the allowances are made available to all who compete in the resale of his product.

The judgment of the Court of Appeals, insofar as it held that the promotional allowances granted Meyer by Tri-Valley and Idaho Canning did not violate § 2 (d), is reversed. The case is remanded to the Court of Appeals with directions to remand to the Commission for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE FORTAS, concurring.

I agree with the result in this case and I join the Court's opinion. The net of our decision, as I see it, is this. The statute permits a supplier to make payment to retailers for services and facilities only if such pay-

---

[24] See 16 CFR §§ 1.55–1.56; cf. "Guides for Allowances and Services," 1 CCH Trade Reg. Rep. ¶ 3980, at 6073–6079.

ment or its equivalent is made available to all competing retailers handling the supplier's product. If they choose to render the same or equivalent service or furnish the same or equivalent facilities, they are entitled to the same payment.* I believe that this result, obviously intended by the Congress, can best be squared with the language of § 2 (d) by the device of regarding the wholesaler and his retail customer as a unit for purposes of that section. The Court is clearly correct in my view in requiring that the opportunity to participate be afforded to the competing retailer, and not merely to the wholesaler. This is the plain thrust and purpose of the section. The supplier may satisfy this obligation by direct dealing with the competing retailer or by arrangement with the wholesaler reasonably designed to transmit to the retailer participation in the program if the retailer chooses to accept.

Mr. Justice Harlan, dissenting.

I dissent because I believe the time has come for a change in approach to Robinson-Patman Act cases that, as here, can only be decided by a judicial *tour de force.* No doubt, the broad purpose of the Act was to protect small sellers from the advantages their larger competitors can obtain through greater buying power. In implementing this purpose, however, the statute imposes a hodgepodge of confusing,[1] inconsistent,[2] and frequently

---

*We need not here consider refinements of the problem—*e. g.,* the duty of the supplier to tailor his offer so that it is within the practical capability of all competing retailers; or negatively, to avoid making an offer which does not permit fair participation by all types of retailers of the product, as a practical matter.

[1] See, *e. g.,* F. Rowe, Price Discrimination Under the Robinson-Patman Act 534; Stedman, Twenty-four Years of the Robinson-Patman Act, 1960 Wis. L. Rev. 197, 218.

[2] See, *e. g.,* Levi, The Robinson-Patman Act—Is It in the Public Interest?, 1 ABA Antitrust Section 60 (1952–1953). As Professor

misdirected[3] restrictions. In such a situation it seems to me the wiser course for this Court to hew as closely as possible to the wandering line that the statute has drawn (with due deference to the expertise of the Commission charged with enforcing the statute) and not to read into the Act its own notions of how best to protect "little people" from "big people."

In this case, certain suppliers made promotional allowances to the company, a direct-buying retailer. The Act provides that if promotional allowances are made to one customer they must also be made, on a basis of proportional equality, to all other "customers competing in the distribution" of the supplier's product. The suppliers here involved did not make the promotional allowances given to the company available to certain retailers who compete with it but who buy not from the suppliers themselves but from wholesalers who in turn buy from the suppliers. The Court now holds, for the first time, 32 years after the passage of the Act, that although these disfavored retailers are not literally "customers" of the suppliers, the "broad goals" of the Act require them to be treated as if they were.

---

Levi noted, published criticism of the Act is unsportingly easy to find: "the literature on the Act has become something of a contest of witticisms to relieve an otherwise dreary picture." *Ibid.* An example is Eine Kleine Juristische Schlummergeschichte, 79 Harv. L. Rev. 921.

[3] See, *e. g.*, Shniderman, The Impact of the Robinson-Patman Act on Pricing Flexibility, 57 Nw. U. L. Rev. 173; Austern, Presumption and Percipience About Competitive Effect Under Section 2 of the Clayton Act, 81 Harv. L. Rev. 773. The confusion is all the more unfortunate in a field where actual conflicting objectives are many: "competitive" purposes are often at odds with "protective" purposes; the defense of traders at one level of distribution may be inconsistent with the liberty of traders at another level, and with the interests of consumers.

Unfortunately, nothing in the Act and not one word of legislative history the Court has found suggest that Congress meant the word "customers" to mean "noncustomers who the Court thinks need protection." The Federal Trade Commission refused to accept the suggestion of one Commissioner that this unexpected nonliteral reading of the word would best effectuate the Act's purposes, so that Commission expertise cannot in this instance be brought to bear in support of the Court's construction.

Furthermore, the failure of the Act to extend explicit protection in the present situation cannot be dismissed as mere legislative oversight. Compelling suppliers to make promotional allowances available to retailers with whom they do not deal is no simple matter. The supplier could deal through his wholesalers, imposing restrictions on them to guarantee that an "allowance" is actually passed through to retailers, only by running afoul of the Sherman Act.[4] Nor would it simplify matters to make the allowances directly available to retailers: by hypothesis, the retailers in question are too small to make direct dealing efficient, and in any event the suppliers and retailers would constantly risk a Sherman Act charge, by the wholesaler in the middle, that they were conspiring in restraint of him.[5]

In addition, under the present circumstances the very idea of "proportional equality" is almost meaningless. The supplier is asked to offer "equal" promotional allow-

---

[4] Under *Albrecht* v. *Herald Co., ante,* p. 145, it would presumably be unlawful *per se* for a supplier to attempt to prevent his wholesalers from absorbing the allowance by charging higher prices.

[5] Under *Albrecht, supra,* n. 4, it is difficult to see why an agreement between supplier and retailer sufficient to insure that wholesalers in the middle do not absorb promotional allowances would not constitute a combination in restraint of these wholesalers.

ances to a direct-buying chain and a set of small retailers who buy through wholesalers who presumably carry much of the promotion load; the supplier risks treble damages if his guess as to what is even-handed treatment turns out to be erroneous. Even if it were desirable to force suppliers to submit every promotion to the FTC for advance approval, the Commission's refusal to require equality between customers and noncustomers here does not indicate that the experts are sanguine about the possibility of working out a rational definition of proportional equality under these circumstances.

The supplier can, of course, resolutely refuse to enter into promotional programs, a course of action that would effectively avoid favoring large distributors. In doing so, however, he would be abandoning one significant form of competition with his fellow suppliers, and would risk the disfavor of retailers who might prevail on differently situated and less timorous competitive suppliers for assistance.

Congress, concerned as it was for small retailers, did not explicitly impose the particular restriction on suppliers announced today. Since, for all we know, the omission may have been deliberate in light of practical considerations, I prefer to take the statute as we find it. This course of action here and in similarly opaque cases might at least encourage the Congress to give this notoriously amorphous statute the thorough overhauling that has long been due.[6] On this basis I consider that this case should go for the respondents.

---

[6] See Friendly, The Gap in Lawmaking—Judges Who Can't and Legislators Who Won't, 63 Col. L. Rev. 787, 794: "The tiniest fraction of the time spent by lawyers, legal writers, administrators, and judges in an unsuccessful endeavor to elucidate the obscurities of this statute would have sufficed to put the house in order once the problems were revealed; but that time has not been spent."

Mr. Justice Stewart, dissenting.

Section 2 (d) of the Clayton Act, as amended by the Robinson-Patman Act, makes it unlawful for a supplier to grant to a customer a promotional allowance which is not available to "all other customers competing in the distribution of such products or commodities." The Federal Trade Commission held that the respondent retailer had violated § 2 (d) by inducing certain of its direct suppliers to grant it promotional allowances which were not available to wholesalers who sold the suppliers' products to retailers competing with the respondent.[1] The Court of Appeals refused to enforce this part of the Commission's order on the ground that the wholesalers were not customers "competing" with the respondent. We granted certiorari limited to a single question:

> "Whether a supplier's granting to a retailer who buys directly from it promotional allowances that are not made available to a wholesaler who resells to retailers competing with the direct-buying retailer violates Section 2 (d) of the Robinson-Patman Act." 386 U. S. 907.

The Court today agrees with the Court of Appeals' answer to this question and holds that wholesalers are not customers "competing" with the respondent. But the Court nevertheless goes on to hold that § 2 (d) was violated upon a theory not argued here by either party. The theory is that retailers who are in fact customers of independent wholesalers are somehow also "customers" of the suppliers of those wholesalers. The Commission has never suggested that this case should turn on any such construction of the term "customer."[2] Cf. *SEC* v. *Chenery Corp.*, 318 U. S. 80.

---

[1] In this opinion the term "respondent" refers to Fred Meyer, Inc.

[2] One Commissioner attempted in vain to persuade the Commission to accept the theory which the Court today adopts: "What

Because the Court of Appeals was correct in rejecting the Commission's construction of § 2 (d), I would affirm its judgment. But, at the very least, the case should be remanded in order to give the respondent notice and an opportunity to defend against the novel construction of § 2 (d) under which the Court today finds the respondent to be a violator of the law. Due process requires no less. Cf. *Cole* v. *Arkansas*, 333 U. S. 196.

---

made this practice illegal, as I see it, is that the allowances were not also made available on proportionally equal terms to Meyer's retail competitors. But that is not the Commission's view of the law." 63 F. T. C., at — (Commissioner Elman, concurring in part and dissenting in part).