**MORRIS ELECTRONICS OF SYRACUSE, INC., Plaintiff,**

**v.**

**MATTEL, INC., Mattel Electronics, Inc. and Louis J. Buduson, Individually, and d/b/a Sound Merchandise, Defendants.**

**No. 83–CV–211.**

United States District Court, N.D. New York.

June 20, 1984.

Berger, Steingut, Weiner, Fox & Stern, New York City, Levene, Gouldin & Thompson, Binghamton, N.Y., for plaintiff; Lawrence I. Fox, New York City, Samuel K. Levene, Binghamton, N.Y., of counsel.

Howrey & Simon, Washington, D.C., Hiscock, Lee, Rogers, Henley & Barclay, Syracuse, N.Y., for defendants Mattel, Inc., Mattel Electronics, Inc., Louis J. Buduson, Sound Merchandise; William R. O'Brien, Washington, D.C., Taylor H. Obold, Syracuse, N.Y., of counsel.

Richard B. Muir, Hilton, N.Y., for defendants Louis J. Buduson, Sound Merchandise.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Sections 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(d) and 13(e) (1976), make it unlawful, in substance, for a seller to furnish promotional and advertising allowances, services, or facilities to a customer in connection with the sale of a product unless such allowances, services or facilities are made available on proportionately equal terms to all other customers that compete for such product on the same level of distribution as the favored customer. *See generally, F.T.C. v. Fred Meyer, Inc.,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). The central issue on this motion is whether the plaintiff, a wholesaler, may assert a claim for damages for injury to its business as a result of the defendant manufacturer's alleged violation of §§ 2(d) and 2(e) by favoring direct-purchasing retailers over the indirect-purchasing retailers supplied through the plaintiff. The court, for reasons set forth herein, concludes that the plaintiff has antitrust standing to assert such claim, and therefore denies defendants' motion for judgment on the pleadings or, in the alternative, for partial summary judgment.

## I.

As alleged in its Amended Complaint, plaintiff Morris Electronics of Syracuse, Inc. ("Morris") is a wholesale dealer in electronics products and appliances. Defendants Mattel, Inc. and its subsidiary Mattel Electronics, Inc. ("Mattel") manufacture, distribute and sell consumer electronics, including its trademarked Intellivi-

**58**

sion master components and game cartridges. Defendant Buduson is a sales representative of Mattel doing business as Sound Merchandise.

Plaintiff asserts four causes of action, which pertain to Mattel's alleged practices in the sale and marketing of its consumer electronics products. The first cause of action alleges that the defendants unlawfully tied and conditioned the sale to Morris of its Intellivision master components to the sale of its handheld and other consumer electronic games in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and Section 3 of the Clayton Act, 15 U.S.C. § 14 (1976). The second cause of action alleges that Mattel unlawfully discriminated in price between Morris and direct purchasing retailers by selling consumer electronics products to direct purchasing retailers at substantially lower prices than to Morris in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) (1976). The third cause of action—which is the subject of this motion—alleges that Mattel provided promotional and advertising allowances, services and facilities to direct-purchasing retailers in connection with the sale of Mattel's consumer electronics products without providing the same allowances, services and facilities to Morris or Morris' retailer customers on proportionately equal terms, in violation of §§ 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(d) and 13(e) (1976). Finally, plaintiff's fourth cause of action incorporates the previous allegations, and asserts a violation of the Donnelly Act, NY GENERAL BUSINESS LAW § 340 (McKinney 1968).

Presently before the court is the defendants' motion, pursuant to Rule 12(c), Fed.R. Civ.P., to dismiss the third cause of action and part of the fourth cause of action in plaintiff's Amended Complaint or, in the alternative, pursuant to Rule 56 Fed.R. Civ.P., for summary judgment as to those claims. Inasmuch as plaintiff does not oppose defendants' motion with respect to part of its fourth cause of action, that motion will be granted, and the court's discussion herein is limited to the sufficiency of plaintiff's claim under §§ 2(d) and 2(e) of the Clayton Act.

## II.

■ For the purpose of considering defendant's Rule 12(c) motion, all of the well-pleaded allegations in the complaint are assumed to be true, and all contravening assertions in the defendants' Answer are taken to be false. *National Metropolitan Bank v. United States*, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383 (1945). *See generally*, 5 Wright & Miller, Federal Practice & Procedure § 1368 (1969 ed.).[1] Turning, then, to the specific allegations in support of the challenged cause of action, the court must assume the truth of the following:

31. ... [I]n furtherance of the sale of Mattel's products by large direct purchasing retailers, including but not limited to J.C. Penny, Kiddie City, a division of Lionel, K-Mart and Radio Shack, Mattel supplied these direct purchasing retailers with promotional and advertising services and facilities for their use and benefit in connection with their sale of Mattel's products, without offering the same allowances, services and facilities to Morris or Morris' retailer customers on proportionately equal terms as those available to these direct-purchasing retailers or by offering the promotional benefits only on a delayed or in an otherwise discriminatory fashion.

For example, Mattel provided its direct-purchasing retail customers with advance notification of a rebate that it would offer to promote sales of Intellivision, which notice enabled such direct-purchasing retail customers, but not its indirect-purchasing retail customers, to place timely advertise-

---

1. Since the parties agree that the issues before the court are issues of law which may be decided from the face of the pleadings, the court will expressly treat the motion brought pursuant to Rule 12(c), and then rule upon the alternative summary judgment motion as a matter of course.

ments of the rebate during the 1982 Christmas season. *Amended Complaint* ¶¶ 32(a)–(d). Morris also discriminated in favor of direct-purchasing retailers by furnishing them with more timely deliveries of products, *id.* ¶ 32(e); more advantageous allocations of in store display materials, *id.;* more advantageous allocations of desired products, *id.;* and more favorable return privileges. *Id.* ¶ 32(f).

As a result of the aforementioned discriminatory conduct, the plaintiff lost profits, sales and goodwill, and its business has been impaired. *Id.* ¶ 35.

### III.

Sections 2(d) and (e) of the Clayton Act, 15 U.S.C. §§ 13(d) and (e), provide as follows:

§ 13. *Discrimination in Price, Services, or Facilities.*

. . . .

(d) Payment for services or facilities. It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale, of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

(e) Furnishing services or facilities. It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnish of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

■ As both parties recognize, these sections only prohibit a seller from discriminating between customers that compete on the same level of distribution; they do not mandate proportional equality between wholesale and retail customers. *F.T.C. v. Fred Meyer, Inc.,* 390 U.S. 341, 348–349, 88 S.Ct. 904, 908–909, 19 L.Ed.2d 1222. In moving to dismiss, the defendants construe the Amended Complaint as alleging that Mattel discriminated in promotional advertising services and facilities between Morris, a wholesale distributor, and direct-purchasing retailers, such as J.C. Penney. They therefore contend that the plaintiff has failed to state a claim, since it has failed to allege discrimination between customers that compete on the same level of distribution.

The complaint does appear to allege, *inter alia,* that the defendants discriminated between Morris and direct-purchasing retailers, see *Amended Complaint* ¶ 31 ("... Mattel supplied these direct purchasing retailers ... without offering the same ... to Morris...."), and to that extent, it does not state a claim. However, the complaint also alleges that the defendants unlawfully discriminated between Morris' retail customers and direct-purchasing retailers—customers that *are* on the same functional level—and that Morris was injured in its business as a result of that unlawful discrimination.[2] Such allegation, if asserted by one of the injured retailers, would presumably state a claim. The issue, there-

**2.** Possibly, plaintiff did not even intend to allege that the defendants discriminated against *it* and in favor of direct purchasing retailers, but rather sought in Amended Complaint ¶ 31 to allege only that the defendants discriminated against *its customers* by failing to furnish proportionately equal allowances, services or facilities to either those customers, or to it. *See F.T.C. v. Fred Meyer, Inc.,* 390 U.S. at 358, 88 S.Ct. at 913 (Nothing we have said bars a supplier ... from utilizing his wholesalers to distribute payments or administer a promotional program, so long as the supplier takes responsibility ... for seeing that the allowances are made available to all who compete in the resale of his product).

fore, is whether plaintiff, a wholesaler, has antitrust standing to assert the claim that the defendants' discrimination among retailers injured it in its business.[3]

## IV.

"Antitrust standing", that is, the right to assert a private antitrust action for damages, has been conferred by Congress upon "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." Clayton Act § 4; 15 U.S.C. § 15. As the Supreme Court explained in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149 (1982),

> "[O]n its face, § 4 contains little in the way of restrictive language." And the lack of restrictive language reflects Congress' "expansive remedial purpose" in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations. (Citations omitted).

However, as the Court subsequently emphasized in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983) (*"Associated General"*), "Congress did not intend to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation," nor did Congress "intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business."

After summarizing the struggle of federal courts "to articulate a precise test to determine whether a party injured by an

antitrust violation may recover treble damages," the Court in *Associated General* conceded the impossibility of announcing a "black letter rule" that could be uniformly applied. It did, however, identify a number of factors for courts to consider when confronted with the recurrent problem of antitrust standing. A recent decision of the Court of Appeals instructs the courts of this circuit "to follow the approaches adumbrated by the Supreme Court in *McCready* and *Associated General* without concern whether the results are consistent with language in earlier Second Circuit cases." *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293 (2d Cir.1983).

### A.

In *McCready*, the Supreme Court focused upon two factors that limit the availability of the § 4 remedy: (1) the risk of duplicative recovery; and (2) the remoteness of plaintiff's alleged injury from the defendant's alleged violation.

In this instance, the risk of duplicative recovery is minimal. As the plaintiff persuasively explains:

> ... [Morris'] injuries are not based upon obtaining a portion of the damages suffered by its customers. Rather, Morris' claims are based upon the profits lost as a result of (i) the cancellation of previously placed orders for Mattel products and (ii) having to provide credits and refunds to its customers, as a consequence of defendants' failure to meet their Robinson-Patman obligations. *Plaintiff's Letter in Opposition* at 5 (9/16/83).

Without regard, at this juncture, to any other challenge to these bases for recovery, it is evident that the plaintiff seeks to

---

**3.** Since the issue is standing, and not the substantive scope of §§ 2(d) and 2(e), defendants' reliance on the holdings of *F.T.C. v. Fred Meyer, Inc.*, *Kirby v. P.R. Mallory & Co., Inc.*, 489 F.2d 904 (7th Cir.) *cert. denied* 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974), and *L.S. Amster & Co., Inc. v. McNeil Laboratories, Inc.*, 504 F.Supp. 617 (S.D.N.Y.1980) is misplaced. None of those decisions squarely address the question

of whether a wholesaler has antitrust standing to sue for injuries it sustained as a result of the defendants' discrimination among retailers. Moreover, even if the issue had been addressed by *Kirby* or *L.S. Amster*, the issue would now have to be considered anew in light of recent Supreme Court decisions on antitrust standing, discussed *infra*.

recover for injuries that are distinct from, and do not duplicate, any injuries its customers might have sustained. *Cf.* 2 Areeda & Turner, *Antitrust Law* ¶ 340d at 214 (1978) (commenting that, where a manufacturer sues its customer's competitor, "duplication could be avoided by awarding each [i.e., the manufacturer and his customer] his lost profits").

Turning next to "the conceptually more difficult question," of whether the injuries are "too remote" from the antitrust violation to afford standing, *McCready*, 457 U.S. at 476, 102 S.Ct. at 2547, the court must consider (a) "the physical and economic nexus between the alleged violation and the harm to the plaintiff"; and (b) "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Id.* at 478, 102 S.Ct. at 2548.

The plaintiff herein is clearly not the *most* immediate victim of the alleged violation; its retail customers would bear the brunt of any discrimination in favor of their competitors. Nevertheless, the "nexus" between the alleged violation and the alleged harm is a close one: if Morris' retailer-customers lose sales of Mattel products such as Intellivision master components to their direct-purchasing competitors, Morris is apt to suffer an impact in its sales of those products to its retailer-customers.

To be sure, a supplier "is usually denied standing to complain that he was injured by selling less to one who was injured by the defendant's alleged antitrust violation." 2 Areeda & Turner, *supra*, ¶ 340e at 217. *See also, Crimpers, supra,* 724 F.2d at 294 (dicta). This general rule may have to be reconsidered in light of *McCready* and *Associated General.* But in any event, the plaintiff here does not merely allege a loss of sales in its business due to a general impairment in its customers' businesses, which in turn is due to the defendants' illegal conduct. Rather, plaintiff alleges a loss in sales and profits with respect to particular finished products because its customers' ability to resell those same products is impaired by the defendants' illegal conduct. Such allegation presents a particularly close connection between the violation and the injury, and has been recognized as a basis for supplier standing. Areeda & Turner, *supra,* ¶ 340 at 212–13.[4]

It is also true that in any given case a supplier may not in fact have sustained—or be able to prove—an impact in its sales or profits as a result of illegal acts that primarily affect its retailer-customers. *See Kirby v. P.R. Mallory & Co., Inc.,* 489 F.2d 904, 911 (7th Cir.), *cert. denied* 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974). But where, as here, the injury is assumed to have occurred for the purpose of this motion, that injury appears to this court to be "precisely 'the type of loss that the claimed violations ... would be likely to cause.'" *McCready,* 457 U.S. at 479, 102 S.Ct. at 2549, *quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ With regard to the question of whether the alleged injury is a type "about which Congress was likely to have been concerned," *McCready,* 457 U.S. at 478, 102 S.Ct. at 2548, the court notes, first, "that Robinson-Patman 'was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of

---

4. Areeda & Turner comment:

On balance, we think that [supplier] standing should be denied unless (1) *the plaintiff's product is virtually identical with that of the defendant, or at least the overwhelming component of the latter in value,* and (2) the proximity of interest is very clear, as evidenced by the fact that the defendant's actions clearly dictated a substantial market response by the plaintiff, and (3) the plaintiff is the injured party whose interest will most likely lead him to vindicate the public interest—as for example, where each immediately-affected dealer is little damaged and can easily shift his attention to other products—and (4) duplicate recoveries can be avoided through a lost-profits measure of damages. *Id.* at 213 (emphasis added).

their greater purchasing power.'" *Jefferson Cty. Pharmaceutical Ass'n. v. Abbott Laboratories*, 460 U.S. 150, 103 S.Ct. 1011, 1017, 74 L.Ed.2d 882 (1983), *citing, inter alia, F.T.C. v. Fred Meyer, Inc., supra. See also,* H.C. Hansen, "Robinson-Patman Law: A Review & Analysis," 51 *Fordham L.Rev.* 1113, 1120–24 (May 1983). More specifically, §§ 2(d) and 2(e) were enacted to prevent sellers from circumventing the ban on price discrimination in § 2(a) by discriminating between buyers through advertising and other sales promotional allowances. *F.T.C. v. Fred Meyer, Inc.*, 390 U.S. at 350–52, 88 S.Ct. at 909, 910.

Undoubtedly, the special focus of Congress' concern in enacting §§ 2(d) and 2(e) were the independent merchants who competed with large chain stores. As the Court noted in *F.T.C. v. Fred Meyer, Inc., id.* at 349–50, 88 S.Ct. at 908–09:

> The role within the statutory scheme which Congress intended for § 2(d) is well documented in the legislative history. An investigation of chain store buying practices undertaken by the Federal Trade Commission, at Congress' request, had indicated that § 2 of the Clayton Act was an inadequate deterrent against outright price discrimination. The investigation also revealed that certain practices by which large buyers induced concessions which their smaller competitors could not obtain were wholly beyond the reach of § 2. It is significant that congressional concern had focused on the buying practices of large retailers, particularly the chain stores, because it was felt that they were threatening the continued existence of the independent merchant.

Moreover, the Court also explained in that case that "the competition with which Congress was concerned in § 2(d) was that between buyers *who competed in resales* of the supplier's products." *Id.* at 356, 88 S.Ct. at 912 (emphasis added). The Court therefore concluded that Congress did not intend, in enacting § 2(d), to compel a supplier to pay to a wholesaler promotional allowances that are proportionately equal to those it pays to retailers.

There is, however, no indication in *F.T.C. v. Fred Meyer, Inc.* or its progeny that the injury caused to a wholesaler by a supplier's discrimination *among retailers* was beyond the concern of Congress. The wholesaler is no stranger to the competitive scheme the statute is designed to protect, and when that scheme is disrupted by violations of §§ 2(d) and 2(e), its injury is "inextricably intertwined" with the injury inflicted upon the retailers. *Crimpers,* 724 F.2d at 294–95, *quoting McCready,* 457 U.S. at 484, 102 S.Ct. at 2551. Indeed, it may well prove to be the case that in certain respects the wholesaler, through refunds or credits to its retailer-customers, may have actually borne the brunt of the antitrust injury. *See McCready,* 457 U.S. at 483, 102 S.Ct. at 2550. Thus, while it is well established that §§ 2(d) and 2(e) proscribe only discrimination among competitors on the same level of distribution, there is little basis for concluding that Congress meant to afford a remedy to those specifically discriminated against, but not those whose injury, like this plaintiff's alleged injury, closely "flows from that which makes the defendant's acts unlawful." *Id.* at 484, 102 S.Ct. at 2551.

### B.

In *Associated General,* the Court resolved an antitrust standing problem by considering a number of factors which overlap, in part, those it considered in *McCready.*

One major factor discussed was "the nature of plaintiff's injury." 103 S.Ct. at 908–10. Here, plaintiff alleges lost sales and profits with respect to Mattel products as a result of the defendants' §§ 2(d) and 2(e) violations. Clearly, the injury is of a general nature ordinarily asserted by antitrust plaintiffs. And as discussed previously, while the plaintiff's injury is not at the epicenter of Congress' concern, it is sufficiently related to the retailer's injury to warrant an inference that Congress did not intend such injury to go unremedied.

A second factor in *Associated General,* also addressed in *McCready,* concerned the directness or indirectness of plaintiff's injury. *Id.* at 910. Undoubtedly, plaintiff's allegations reveal a causal connection between the violation and its injury, *id.* at 908; moreover, in the language of torts, the violation would be considered a "proximate cause" of the injury, which was "foreseeable." *See id.* at 905–06, n.'s 24, 25. As discussed above, while the plaintiff was not likely to have been the *most* direct victim of the §§ 2(d) and 2(e) violations, *but see ante at* 14, the nexus between the alleged violation and the alleged harm was close indeed.

The Court in *Associated General* also articulated its version of the "best plaintiff" principle that is often considered when standing is an issue:

> The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general. Denying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied.

*Id.* at 911. *See also,* Wright, Miller & Cooper, *13 Federal Practice & Procedure: Jurisdiction* § 3531 at 211 (1975 ed.).

In this instance, although the plaintiff is perhaps "more remote" than its retailer-customers, that is counterbalanced since the plaintiff appears uniquely situated to litigate matters that its individual retailer-customers might not be as able to litigate on their own behalf. *See* Areeda & Turner, *supra,* ¶ 340c at 213 (supplier standing is warranted where, *inter alia,* "the plaintiff is the injured party whose interest will most likely lead him to vindicate the public interest—as, for example, where each immediately-affected dealer is little damaged and can easily shift his attention to other products...").

A fourth factor identified in *Associated General* concerned the speculative nature of the damages alleged. *Id.* at 911. In *Associated General,* for instance, a union claimed that an employer association coerced certain third parties to enter into business relations with non-union contractors and subcontractors in violation of the Sherman Act; the Court found plaintiff's claim of damages "highly speculative," due in part to the indirect and remote nature of the union's injury.

Here, in contrast, plaintiff alleges that the defendants discriminated against indirect-purchasing retail merchants in promotional and advertising allowances, services, and facilities in violation of §§ 2(d) and 2(e) of the Clayton Act. As discussed previously, such discriminatory conduct could well impact upon the profits and sales of a wholesaler supplying the affected products to the indirect-purchasing retailers. The court is unprepared, on this motion directed toward the pleadings, to conclude that such damages would necessarily be too speculative to permit this action to proceed. Indeed, the business records of Morris and its customers might with elucidation by expert and non-expert witnesses, reveal the amount of damages plaintiff sustained, if any, with considerable precision. Like the plaintiff in *Crimpers,* Morris' losses "should be proveable under the liberal principles long recognized in antitrust cases." 724 F.2d at 297.

A final factor discussed in *Associated General* was the projected difficulty in "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." 103 S.Ct. at 912. In this court's view, set forth previously in the course of discussing the *McCready* factors, duplicate recovery can be avoided by focusing upon plaintiff's lost profits. That lodestar should enable the court to avoid a complex apportionment of damages as well.

█ Accordingly, while the court acknowledges that the question of plaintiff's standing is not insubstantial, a review of the claim in light of the factors articulated by the Supreme Court in *McCready* and *Associated General* lead to a conclusion

that this plaintiff is, on the basis of its pleading, a person "injured in his business or property by reason of anything forbidden in the antitrust laws." Clayton Act § 4.

## V.

In the event that this court did not recognize plaintiff's standing to sue for its own injury, plaintiff contended that it would have standing to assert the antitrust claims of its retailer-customers by virtue of several assignments executed and delivered by such customers to the plaintiff. The defendants respond, with considerable support in this court's view, that such assignments are champertous under New York law, *see* NY JUDICIARY LAW § 489 (McKinney 1983) and therefore void. In view of the court's holding above, that plaintiff has standing to assert a claim for its injuries, it is not necessary to rule upon the validity of the assignments. However, it should be stated at this point that, under the court's reading of the Amended Complaint, plaintiff is suing to recovery only *its* damages, and not any damages sustained by its customers.

## VI.

In addition to challenging the third cause of action *in toto* on standing grounds, defendants also challenge specific allegations therein as failing to state a claim under §§ 2(d) and 2(e) of the Clayton Act. Specifically, defendants contend that insofar as the plaintiff alleges that Mattel provided "direct-purchasing retailers with more timely deliveries of product" and "more advantageous allocations of desired products," *Amended Complaint* ¶ 32(e), "refused to honor written and oral cancellations," and "pre-released" shipments of products to Morris, *Amended Complaint* ¶ 32(f), it has failed to allege anything forbidden by the statute invoked.

Clearly, there is a division of opinion among courts as to whether such allegations fall within the scope of the §§ 2(d) and 2(e). *Compare, e.g., L & L Oil Co., Inc. v. Murphy Oil Corp.,* 674 F.2d 1113, 1118–19 (5th Cir.1982) (delivery is not a "service or facility" within the meaning of § 2(e); moreover, § 2(e) requires that the service or facility relate to the *resale* of the product, and problems associated with delivery concern only the original sale) *with Centex-Winston Corp. v. Edward Hines Lumber Co.,* 447 F.2d 585 (7th Cir.) *cert. denied,* 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972) (delivery is a "service or facility" within the meaning of § 2(e)). In this circuit, one district court adopted the *Centex-Winston* position, *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.,* 371 F.Supp. 701 (S.D.N.Y.1974), and was affirmed, although without discussion of this issue. 493 F.2d 1352 (2d Cir.1974). However, subsequent decisions by other district courts in this circuit have ruled that problems associated with delivery are beyond the scope of § 2(e). *O'Connell v. Citrus Bowl, Inc.,* 99 F.R.D. 117, 121 (E.D.N.Y.1983); *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110 (E.D.N.Y.1976).

After reviewing the language of the statute and the pertinent authorities, this court is convinced, first, that the Second Circuit has not clearly adopted the *Centex-Winston* position, and second, that the *L & L Oil Co., Inc.,* position is correct. As explained at some length in *L & L Oil Co., Inc.,* § 2(e) was "aimed at advertising and other promotional services," *id.* at 1118, and that, "[e]xcept for *"Centex-Winston* and the cases adopting its holding, the only arrangements courts have found to be services or facilities are those relating to promotional favors." *Id.* at 1119, *citing, inter alia, F.T.C. v. Simplicity Pattern, Co.,* 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). Moreover, there is more than ample authority for *L & L Oil Co., Inc.'s* conclusion that § 2(e) requires that the service or facility relate to the resale of the product by the purchaser as opposed to the original sale from the supplier to the purchaser. *See e.g., Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1327–28 (6th Cir.1983); *Foremost Pro Color v. Eastman Kodak Co.,* 703 F.2d 534, 546 (9th

Cir.1983); *O'Connell v. Citrus Bowl, Inc.,* *supra* 99 F.R.D. at 121. *See also,* 5 von-Kalinowski, *Antitrust Laws and Trade Regulation* § 35.02 (1983). Thus, § 2(e) is violated neither by discriminatory deliveries of products, *L & L Oil Co., Inc.,* nor by discriminatory allocation of products. *Holleb & Co. v. Produce Terminal Cold Storage Co.,* 532 F.2d 29, 33 (7th Cir.1976); *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 55 (4th Cir.) *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975). *A fortiori* the allegation of pre-released shipments must fall as well.

However, insofar as plaintiff alleges discrimination with respect to written and oral cancellations, it has been held that a seller who permits certain of its customers to return unsold goods for credit, while not extending the same privilege to other customers violates § 2(e). *Bouldis, supra,* 711 F.2d at 1328. At least until such time as the factual basis for plaintiff's allegation with respect to cancellations becomes clearer, the court declines to rule it insufficient under § 2(e).

ACCORDINGLY, the court denies defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment with respect to the third cause of action, except insofar as plaintiff claims violations of §§ 2(d) and 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, based on allegations that Mattel provided "direct purchasing retailers with more timely deliveries of product" and "more advantageous allocations of desired products," *Amended Complaint* ¶ 32(e), and "pre-released" shipments of products to Morris, *Amended Complaint* ¶ 32(f), with respect to which allegations the court grants judgment on the pleadings for the defendants; and the court grants defendants' motion for judgment on the pleadings with respect to the fourth cause of action insofar as plaintiff claims violations of NY GENERAL BUSINESS LAW §§ 340 *et seq.* based on allegations of price discrimination.

IT IS SO ORDERED.