**NATIONAL AUTO BROKERS CORPO-RATION et al., Plaintiffs,**

**v.**

**GENERAL MOTORS CORPORA-TION et al., Defendants.**

**No. 70 Civ. 5421A.**

United States District Court,
S. D. New York.

April 5, 1974.

See also, D.C., 332 F.Supp. 280.

Carl E. Person, New York City, for plaintiffs.

Sullivan & Cromwell, New York City, for defendants Ford Motor Co., Grand Ford, Inc., Gotham Ford, Inc., and Robin Ford Sales, Inc. and Local Counsel pursuant to General Rule 4(a) for defendant American Motors Corp.; William Piel, Jr., William R. Norfolk, Ulric R. Sullivan, New York City, of counsel.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for defendant Chrysler Corp.; Robert Ehrenbard, Bud G. Holman, William A. Krohley, New York City, of counsel.

Cross, Wrock, Miller & Vieson, Detroit, Mich., for defendant American

Motors Corp.; Jay A. Herbst, Detroit, Mich., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants General Motors Corp., General Motors Acceptance Corp., Frederic G. Donner and James M. Roche; Martin Kleinbard, Sidney S. Rosdeitcher, Lewis A. Kaplan, Allyne R. Ross, New York City, of counsel.

## OPINION

GRIESA, District Judge.

This is an action, involving mainly antitrust charges, brought by a company called National Auto Brokers Corp. ("Nabcor") against General Motors, Ford, Chrysler and American Motors and other defendants.

As will be described in more detail shortly, Nabcor claims to have organized a system of franchised brokers, who, for modest fees, act as agents for retail auto buyers, and arrange for purchases of automobiles from automobile dealers at substantially less than regular retail prices. According to the complaint, the alleged Nabcor organization consists basically of Nabcor at the top of a system of brokers to which Nabcor sells franchises. Beneath Nabcor, there are three levels of brokers: "master brokers", "area brokers" and simply brokers.

The four auto manufacturer defendants have moved for partial summary judgment dismissing the claims in the complaint made under the Robinson-Patman Act and certain other claims. The motions are granted in part and denied in part.

Plaintiffs have moved for class action treatment. In an unreported bench decision of November 7, 1973, I denied this motion as to one of the classes sought to be represented. In the present opinion I am denying plaintiffs' motion as to the other class.

*The Parties and Certain Prior Proceedings*

The original complaint, filed December 10, 1970, contained 27 counts. Counts 9–13, relating to advertising practices of various newspaper defendants were severed from this action on March 2, 1973, National Auto Brokers Corp. v. General Motors Corp., 1973 CCH Trade Cas. ¶ 74.405 (S.D.N.Y.1973), and were assigned docket number 70 Civ. 5421B.

The instant action now bears docket number 70 Civ. 5421A. The complaint charges numerous violations of the antitrust laws by defendant automobile manufacturers, various dealers franchised by the manufacturers, financial institutions and other parties named as defendants and co-conspirators, directed against plaintiff Nabcor and its organization.

There are ten named plaintiffs. The first three plaintiffs are Nabcor, and Frank Maiorana and Anthony Maiorana, the principals of Nabcor.

Plaintiff General Auto Sales & Leasing, Inc. is alleged to have been, from 1967 to 1970, a Nabcor "master broker" in Lancaster, New York. This is said to be the second tier in the Nabcor organization. Plaintiff Dale Strimpel was the principal of General Auto Sales.

Plaintiff Nabcor of East New York, Inc. ("Nabcor East") is alleged to be a master broker in Yonkers, New York.

Plaintiff Courtesy Auto Brokers, a partnership, is alleged to have been, from February to December 1968, an "area broker" (the third tier in the Nabcor organization) in Huntington Station, New York.

Plaintiff Robert B. Heim is alleged to have been doing business as Robert Heim Auto Sales in Bethlehem, Pennsylvania, and to have acted as a Nabcor area broker in 1969–70.

Plaintiff Louis H. Jamele is alleged to operate Lou's Auto Mart in Middlebury, Connecticut and Waterbury, Connecticut, and is alleged to be a Nabcor broker.

Plaintiff Alfred J. Young is alleged to do business as A. J. Young, Sr. Auto Sales in Watertown, New York, and is alleged to be a Nabcor broker.

Plaintiffs moved for class action treatment, seeking to represent two classes, one called the "broker class" and

consisting of Nabcor and the 250 or so brokers in the Nabcor organization; the other, called the "retailer class", consisting not only of Nabcor and its 250 brokers, but also all regular franchised auto dealers, all companies engaged in the automobile fleet leasing business, and all other brokers such as Nabcor. The total membership of this retailer class was allegedly about 42,000. On November 7, 1973, in an unreported bench decision, this Court denied class action treatment with respect to the retailer class except for the Nabcor organization, and reserved decision as to class action status for the broker class. The latter issue will be dealt with later in this opinion.

### Summary Judgment Motions

It should be stated at the outset that my rulings on the summary judgment motions relate only to claims of the named plaintiffs in this action. I am not ruling as to possible claims of parties not before the Court, including absent members of the Nabcor "broker class".

### Summary of Counts

The following is a summary of the counts involved in the summary judgment motions. Counts 14-17 are brought by and on behalf of Nabcor and its broker-franchisees against General Motors, Ford, Chrysler and American Motors and allege price and other discrimination in violation of Sections 2(a), 2(d) and 2(e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(d) and 13(e). Counts 16 and 17 also refer to Section 2(f) of the Act. 15 U.S.C. § 13(f).

Counts 18-27 were originally brought on behalf of the entire "retailer class" referred to earlier. The Court has already denied class action treatment to the retailer class, except as to the Nabcor organization. Thus Counts 18-27 will only be considered with respect to Nabcor and its broker-franchisees. Counts 18-27 are brought against the four auto manufacturer defendants.

Counts 18-20 are brought under Sherman Act §§ 1, 2 and 3 respectively (15 U.S.C. §§ 1, 2 and 3) and allege illegal practices by the auto manufacturers regarding "destination charges".

Count 21 alleges that the destination charges involve price discrimination in violation of Robinson-Patman Act § 2(a).

Count 22 alleges that the destination charges involve unlawful tying in violation of Clayton Act § 3, 15 U.S.C. § 14.

Count 23 accuses the manufacturers of common law fraud in connection with the destination charge.

Counts 24-26 are further charges of price discrimination under Robinson-Patman Act § 2(a). Count 27 alleges "service discrimination" under Robinson-Patman Act § 2(e).

The auto manufacturer defendants seek, on their summary judgment motions, dismissal of Counts 14-17 and 21-27, and Counts 18-20 as to all plaintiffs except Nabcor. These defendants also seek dismissal of *certain* of the claims of Nabcor asserted in Counts 18-20.

### Statutory Provisions

Section 2(a) of the Robinson-Patman Act, the price discrimination provision, provides in relevant part as follows:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . . *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or

merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: . . . " 15 U.S.C. § 13(a).

Section 2(d), which bars discriminatory payments by a seller to a buyer for promotional services, provides:

"(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." 15 U.S.C. § 13(d).

Section 2(e), which prohibits discriminations in promotional services when the seller furnishes the service to the buyer, provides:

"(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers, of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." 15 U.S.C. § 13(e).

Section 2(f) of the Robinson-Patman Act provides:

"(f) It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f).

Certain other statutory provisions are relevant, but need not be quoted at this point.

*Grounds for Summary Judgment Motions*

Defendant auto manufacturers assert that all of the Robinson-Patman Act claims should be dismissed because plaintiffs are not "purchasers" or "customers" within the meaning of the statutory provisions, but are instead merely purchasing agents for the real purchasers or customers—the ultimate car buyers. The moving defendants also contend that, in any event, plaintiffs are not purchasers *from* or customers *of* the auto manufacturers, as required by the statutory provisions. Defendants assert that if plaintiffs purchased automobiles at all, such purchases were made from franchised auto dealers, not from the auto manufacturers.

Defendants make another contention specifically directed to certain Robinson-Patman Act claims of discrimination against Nabcor and its brokers in favor of "fleet purchasers" of automobiles. Defendants contend that such fleet purchasers are not in competition with Nabcor and its brokers.

Specifically as to Count 27, alleging that defendant manufacturers solicit fleet sales and direct these sales to certain favored dealers rather than to Nabcor, defendants urge that the claim is groundless since plaintiffs admit that they have never sold to fleet buyers and have never intended to do so.

With regard to the Sherman Act claims for alleged overcharges (Counts 18–20), defendants assert that plaintiffs sustained no injury because these overcharges were passed on in their entirety. The same defense is asserted with respect to the common law fraud claim (Count 23) regarding the alleged overcharges.

As to the Clayton Act § 3 claim (Count 22), alleging that certain unlawful "destination charges" were imposed, defendants contend that the claim in ef-

fect alleges the tying of a service to a commodity—something not covered by the statute.

## Nabcor's System of Business

Plaintiffs assert that there is a sharp differentiation between the Nabcor system and regular franchised automobile dealers. In the first place, Nabcor and its brokers deal in *any brand* of automobile. Nabcor is not franchised by any auto manufacturer, and its brokers generally have no such franchises.

Another claimed distinction between the Nabcor system and regular franchised auto dealers is that the Nabcor brokers generally do not have retail show rooms or repair shops and do not need to make large capital or overhead expenditures. The complaint alleges that for this reason "the Nabcor organization was able to sell new automobiles of any make or model at a markup substantially discounted from the markup needed or desired by franchised dealers" (par. 107).

However, the Nabcor organization obtains its cars from regular franchised automobile dealers. When Nabcor started its business in 1966, its concept was that it would purchase automobiles from these franchised dealers on a "fleet" or wholesale basis.[1] The complaint alleges that from 1966 to the time of the filing of the action (December 1970) plaintiffs purchased more than 1,000 new automobiles from franchised automobile dealers.

## The "Purchaser"–"Customer" Issue

■ As the statute itself indicates, in order to maintain a cause of action under Section 2(a) of the Robinson-Patman Act, the plaintiff must be a purchaser from the person charged with the discrimination. Klein v. Lionel Corp., 237 F.2d 13, 14–15 (3d Cir. 1956).

Mere sales agents are not covered. Loren Specialty Mfg. Co. v. Clark Mfg. Co., 360 F.2d 913, 914–15 (7th Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 392, 17 L. Ed.2d 303 (1966). Section 2(e) also applies only to purchasers. Section 2(d) uses the term "customer", which is given the same meaning as the term "purchaser" in Sections 2(a) and 2(e). American News Co. v. FTC, 300 F.2d 104, 109 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962).

■ The moving defendants contend that none of the plaintiffs was a purchaser or customer within the meaning of the Robinson-Patman Act.

According to the complaint, the "markup" made by the Nabcor organization actually consists of what plaintiffs call a "brokerage commission" (pars. 5(ii) and 107). The complaint alleges that this brokerage commission is usually about $200.

Defendants contend that the Nabcor organization is solely a system of brokers or agents, representing the ultimate car buyers for a commission. Defendants assert that these car buyers are the only purchasers or customers in the transactions.

Defendants assert that the facts admitted by plaintiffs demonstrate that Nabcor takes title to the cars, if at all, only in the most technical sense; that Nabcor risks no funds and maintains no inventory; that Nabcor places orders with franchised dealers only after it receives an order from a consumer buyer.

The trouble is that there are other parts of the record which at least raise triable issues of fact on the question of whether plaintiffs, or some of them, made purchases of automobiles, as distinct from merely acting as agents.

Certain documents in the record, including sample purchase forms, indicate

1. According to a document entitled "Nabcor Marketing and Administration Manual" the Nabcor concept was given some encouragement by the Supreme Court decision in United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), in which the Court held that it was illegal for General Motors and certain Chevrolet dealers to attempt to prevent other Chevrolet dealers from selling cars at low prices to discount houses.

that there were two steps in the typical transaction which might properly be characterized as sales. According to the sample forms, the car buyer would give the Nabcor broker a "power of attorney" to purchase a specified car from Nabcor. Then Nabcor would purchase the car from a franchised dealer of one of the manufacturers. The record contains examples of invoices from auto dealers reciting that certain cars were "sold to Nabcor Inc."

Apparently the Nabcor concept is that Nabcor would act as the central purchaser for all cars ordered through the system, although, under certain circumstances, brokers might order directly from a franchised dealer.

Plaintiffs have conceded that those brokers who merely obtained a power of attorney from a customer and transmitted an order to Nabcor are not purchasers or customers within the meaning of the Robinson-Patman Act. Of the named plaintiffs, this concession would apply to Courtesy, Heim, Jamele and Young. However, plaintiffs contend that General Auto Sales and Nabcor East purchased a few cars directly from franchised auto dealers. And, more important, plaintiffs contend that Nabcor has purchased several hundred, or perhaps about 1,000, cars from franchised dealers. Plaintiffs therefore contend that Nabcor, General Auto Sales and Nabcor East are purchasers and customers within the meaning of the Robinson-Patman Act.

The moving defendants are entitled to summary judgment dismissing all the Robinson-Patman Act counts (Counts 14–17, 21, 24–26) as to plaintiffs Courtesy, Heim, Jamele and Young, on the ground that these plaintiffs were not purchasers or customers but were merely agents. However, on this question, the present record demonstrates that there are triable issues of fact relating to plaintiffs Nabcor, Nabcor East and General Auto Sales.

An alternative contention of defendants is that, even if Nabcor, Nabcor East and General Auto Sales can be considered to be purchasers or customers, as distinct from being mere agents, nevertheless these plaintiffs were not purchasers *from* or customers *of*, any of defendant manufacturers, since these plaintiffs did not buy from the manufacturers, but only from franchised dealers.

On this issue, which is somewhat complex, one of the problems is that defendants have not undertaken to analyze in any detail the specific elements of the various counts. Defendants have taken the position that "it is unnecessary to sort out plaintiffs' intricate allegations" (Memorandum of June 25, 1973 p. 11), and contend that they have a defense which cuts across all the Robinson-Patman claims and conclusively defeats them. I do not blame defendants for trying to simplify the case. But after some amount of struggle with defendants' contentions, I have concluded that the only sure way to deal with plaintiffs' claims is in fact to analyze them in all their aspects and details. Unfortunately, when this is done, issues are revealed which defendants have not dealt with in their summary judgment motions.

Let us take, for instance, defendants' assertion that purchases from franchised auto dealers are not purchases from the manufacturers, and therefore no Robinson-Patman Act claims against the manufacturers will lie.

Count 14 alleges that each of the defendant manufacturers adds to the wholesale price of a new automobile sold to a franchised dealer an amount ranging from $15 to $25, which is turned over by the manufacturers to dealer organizations or associations to be spent on advertising for the benefit of the dealers. It is alleged that leasing companies and fleet purchasers[2] are not required to pay these advertising contributions or, if they do, they receive a re-

---

**2.** The record indicates that leasing companies and other fleet purchasers usually buy their cars from franchised dealers, not directly from the manufacturers.

fund of the whole amount of such contributions from the manufacturers. It is alleged that Nabcor receives no refund of any part of such advertising contributions, which are paid by Nabcor as part of the price it pays to the franchised dealers.

Nabcor contends that it is in competition with the leasing companies who lease cars to customers on a long-term basis. Plaintiffs contend that such leases, especially if there is an option to buy at the end, are the "functional equivalent" of sales. Nabcor contends that the auto manufacturers discriminate in favor of these long-term leasing companies by making refunds of the advertising contributions to them, but not making such refunds to Nabcor.

Thus Count 14 alleges that certain competitors of Nabcor, although they purchase cars from dealers and not from the manufacturers, nevertheless are later granted monetary benefits directly by the manufacturers, which are not granted to Nabcor. Certain other Robinson-Patman counts allege that the auto manufacturers reach over the heads of the franchised dealers and confer benefits directly upon the long-term leasing companies, which are not conferred upon Nabcor. Count 16 alleges that the auto manufacturers make "warranty programs" available to leasing companies. It is alleged that under such programs leasing companies are permitted to perform their own warranty work on new automobiles they purchase and are compensated by the manufacturers for parts and labor in connection with such work. Count 24 alleges that the leasing companies receive directly from the manufacturers a "fleet rebate" amounting to 1–5% of the wholesale price of cars purchased. Count 17 alleges that these and certain other benefits are made available directly by the manufacturers to leasing companies who have "fleet certificates".

The question naturally arises as to whether, under these allegations, the leasing companies might be considered to be purchasers from, or customers of, the auto manufacturers, because of the fact that the manufacturers have involved themselves directly in the sales transactions, even though the actual purchases were initially made from dealers, not from the manufacturers. Another question which necessarily follows is this: If the manufacturers reach over the heads of the franchised dealers and confer pricing and other benefits on Nabcor's alleged competitors, which they do not grant to Nabcor, does Nabcor have a valid claim for discrimination under the Robinson-Patman Act against the manufacturers?

This is, in my view, the precise issue which Nabcor is raising in its Robinson-Patman Act claims of discrimination by the manufacturers in favor of the leasing companies. But the moving defendants do not address themselves to this problem in the briefs and affidavits which they have filed on the present motions.

To be sure, when this issue was raised at oral argument, there was considerable discussion. But such discussion does not, in my opinion, lay the matter to rest sufficiently to justify summary judgment.

Indeed, the discussion at the oral argument indicated that the issue cannot be resolved simply on the basis that the actual purchases are made from the franchised dealers, and not from the auto manufacturers. Defense counsel conceded that if a franchised dealer makes auto sales to two leasing companies and then the manufacturer reaches over the dealer and gives a refund to one leasing company at one rate and a refund to the second leasing company at a lesser rate, then there would be a Robinson-Patman Act cause of action against the manufacturer, because the manufacturer "tried to involve itself in a sale" (Minutes of February 26, 1974 pp. 17–18).

Defense counsel urge that the hypothetical example has no application to Nabcor's claims. The argument is that in the hypothetical case the auto manufacturer intends to deal, and does actually deal, with both of the leasing compa-

nies. Defense counsel contend that the record in the present case demonstrates conclusively that the auto manufacturers do not intend to deal, and do not in fact deal, with Nabcor or its franchisees. The auto manufacturers argue that they are exercising their right *not* to deal with Nabor—a right enunciated in United States v. Colgate, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and expressly embodied in Section 2(a) of the Robinson-Patman Act.

The manufacturer defendants may well be right in their position. But I am forced to conclude that the issue has not been dealt with sufficiently on the present summary judgment motions to justify a ruling in defendants' favor at this juncture.

■ I should mention at this point the contention of the manufacturer defendants that there can be no valid claims under Sections 2(d) and 2(e) of the Robinson-Patman Act for discrimination in favor of the fleet purchasers and leasing companies because they do not *resell* in competition with Nabcor. Section 2(e) outlaws discrimination in favor of one purchaser against another purchaser "on a commodity bought for resale". Section 2(d) outlaws discrimination among "customers competing in the distribution" of the products. It has been held that the term "distribution" in Section 2(d) does not differ in meaning from the term "resale" in Section 2(e). Clairol Inc. v. FTC, 410 F.2d 647, 648 (9th Cir. 1969).

Plaintiffs have in effect conceded that, as far as their Robinson-Patman claims of discrimination in favor of fleet purchasers and leasing companies are concerned, such claims are limited to situations involving long-term leasing companies, which are said to make the functional equivalent of sales (Minutes of February 26, 1974 pp. 4–9).

In response, the manufacturer defendants have cited certain cases to indicate that leases cannot be considered to be resales within the meaning of Sections 2(d) and 2(e) of the Robinson-Patman

Act. However, in my view, none of these authorities is close enough in point to permit summary judgment in favor of defendants on this issue or to preclude possible factual issues about whether a long-term lease is the functional equivalent of a sale.

■ In any event, the argument about the requirement of "resale" applies only to claims under Sections 2(d) and 2(e). Defendants do not argue that there is the same requirement under Section 2(a). Defendants have not attempted to actually analyze what sections of the Robinson-Patman Act might cover the specific claims of discrimination made in the complaint. However, it would seem to me that the claims relating to discriminatory refunds of advertising contributions and discriminatory rebates in Counts 14, 17 and 26 would fall under Section 2(a), rather than under Sections 2(d) and 2(e). Thus defendants' argument about "resale" would not apply to such claims.

For all the foregoing reasons, I am denying the motions of the manufacturer defendants for summary judgment as to Counts 14, 16, 17 and 24, insofar as those counts allege discrimination by the manufacturers against plaintiffs and in favor of leasing companies.

A number of the Robinson-Patman Act claims allege discrimination by the manufacturers against Nabcor and its franchisees in favor of the franchised dealers. Such claims can, at the most, be made by those plaintiffs who have actually purchased cars—Nabcor, Nabcor East and General Auto Sales.

I agree with the moving defendants that such claims are on their face somewhat anomalous. It is difficult to see how the Robinson-Patman Act requires auto manufacturers to assure that a party such as Nabcor purchasing *from* a franchised dealer will receive equal treatment on price and promotional services to that received by the franchised dealers.

■ The statute generally contemplates situations where the favored and

the disfavored purchasers or customers are buying directly from the same source of supply. An exception has been made to provide a cause of action under Section 2(d) for a retailer buying indirectly—i. e., through a wholesaler— where the supplier has discriminated in favor of a direct-buying retailer. FTC v. Fred Meyer, Inc., 390 U.S. 341, 88 S. Ct. 904, 19 L.Ed.2d 1222 (1968).

Defendants assert that the *Fred Meyer* rule has no application to the present case. Defendants assert that in *Fred Meyer* the suppliers intended to have their products distributed through the indirect-buying retailers as well as through the direct-buying retailers, whereas in the present case the auto manufacturers do not desire or intend to use Nabcor in their distribution system, and are in no way required to do so. Also, in *Fred Meyer* the discrimination which was proscribed was not between the indirect-buying retailers and *their* intermediate sources of supply—i. e., the wholesalers. Indeed the Court in *Fred Meyer* stated that Section 2(d) "was meant to impose proportional equality only where buyers competed on the same functional level". 390 U.S. at 356, 88 S.Ct. at 912. Thus, according to defendants, *Fred Meyer* cannot be construed as requiring an automobile manufacturer to provide equal treatment as between its franchised dealers, and Nabcor, which purchases from the dealers and is at the next level of distribution.

But the Court in *Fred Meyer* stated:

"We recognize that it would be both inappropriate and unwise to attempt to formulate an all-embracing rule applying the elusive language of the section to every system of distribution a supplier might devise for getting his product to the consumer." 390 U.S. at 357, 88 S.Ct. at 912.

Indeed, there is some authority for the proposition that a supplier may have obligations of equal treatment under Sections 2(d) and 2(e) to a retailer purchasing from that supplier, and to another retailer purchasing from the first retailer. FTC Guides for Advertising Allowances and Other Merchandising Payments and Services, 16 C.F.R. § 240.3(b), which states:

"(b) 'Competing customers' are all businesses that compete in the resale of the seller's products of like grade and quality at the same functional level of distribution regardless of whether they purchase direct from the supplier or through some intermediary.

"Example 1: A manufacturer sells to some retailers directly and to others through wholesalers. Retailer 'X' purchases the manufacturer's product from a wholesaler and resells some of it to retailer 'Y.' Retailer 'X' is a customer of the manufacturer. Retailer 'Y' is not a customer unless the fact that he purchases the manufacturer's product is known to the manufacturer."

Under this guideline there are at least two questions of fact on the issue of whether Retailer "X" and his customer, Retailer "Y", are both "competing customers" of the manufacturer. The first question is whether these two retailers compete in the resale of the manufacturer's products. The second is whether the manufacturer knows about the purchases made by "Y" from "X".

Defendants challenge both the authority and applicability of these FTC guides. Defendants may well be correct. The problem is that here again the moving defendants have not sought to apply their arguments to any detailed analysis of the specific Robinson-Patman discrimination claims made in the complaint. This difficulty is illustrated if we look once more at Count 14 of the complaint. As already described, this count relates to the alleged advertising contributions, and asserts that such contributions are levied by the manufacturers upon the franchised dealers and then paid by the manufacturers to dealers' associations for advertising benefiting the dealers. As noted earlier, one phase of Count 14 is a claim of discrimination against Nabcor and in favor of leasing

companies, because of the fact, as alleged, that the auto manufacturers refund the amounts of the contributions to the leasing companies, but make no such refunds to Nabcor.

Count 14 also makes a claim of Robinson-Patman Act discrimination against Nabcor in favor of the franchised dealers. Count 14 (par. 144) alleges that the effect of the advertising contribution practice is to:

> "(a) Require Nabcor to pay for advertising for the benefit of franchised dealers who may be in competition with Nabcor or any of its franchisees."

■ Clearly the claim of discrimination in favor of the franchised dealers is not a Section 2(a) claim, because there is no price concession given to the dealers. Indeed, the dealers are *paying* the advertising contribution. Also, this is clearly not a promotional payment claim under Section 2(d) since no such payments are being made by the manufacturers to the dealers.

The matter is not so simple as far as Section 2(e) is concerned. Plaintiffs are apparently claiming that the manufacturers are furnishing, or contributing to the furnishing of, advertising services for the benefit of the dealers, which do not benefit Nabcor and its franchisees. Nabcor further contends that it competes with the dealers for retail sales, having purchased cars from the dealers at wholesale, or near wholesale, prices.

Are the manufacturer defendants entitled to summary judgment on this claim? In my view, it would be inappropriate to grant such judgment, when defendants have not analyzed or met the claim squarely. The same is true with respect to all the other claims of discrimination in favor of the franchised dealers, except for Count 27, which will be dealt with shortly. The other counts containing such claims aside from Count 14, which has been discussed, are Counts 15, 16, 25 and 26.

■ As to all the claims of discrimination against Nabcor in favor of the franchised dealers contained in Counts 14, 15, 16, 25 and 26, the motions for summary judgment are denied.

*Count 27*

■ Count 27 alleges that the manufacturer defendants have violated Section 2(e) of the Robinson-Patman Act by directing prospective fleet purchasers of automobiles to the franchised dealers, but not directing them to Nabcor. There are conclusive admissions in the record that the Nabcor organization has never made sales to fleet purchasers, and does not intend to make such sales. Defendants are entitled to summary judgment dismissing Count 27.

*Counts 18–23*

Counts 18–23 (pars. 166–178) allege in essence that the four manufacturer defendants include a so-called "destination charge" in the price charged to dealers for new cars, which purports to be a freight charge but which allegedly exceeds the actual costs of transportation. Two types of injury allegedly flow from the distribution charges. First, it is claimed that the destination charge is in part an illegal overcharge to the dealers (Complaint pars. 170(d) and (e)). Second, it is claimed that the destination charge is calculated in such a way as to prevent dealers from transporting automobiles from one area to another (Complaint pars. 170(f) and (g)). This is the so-called "transshipment" theory. Regarding the latter theory, the manufacturer defendants are willing to construe it as encompassing a claim that Nabcor was prevented from freely arranging for the shipment of automobiles from one area to the other.

The manufacturer defendants move for summary judgment dismissing Counts 18–20 except with respect to the "transshipment" claim made by Nabcor. These defendants also move for summary judgment as to Counts 21–23 in their entirety.

Counts 18–20 are brought under the Sherman Act. Count 21 is brought un-

der Section 2(a) of the Robinson-Patman Act. Count 22 is brought under Section 3 of the Clayton Act. Count 23 is based on the theory of common law fraud.

The main thrust of all of these counts is a claim of injury to *franchised auto dealers* because of the allegedly illegal destination charges *they* are compelled to pay. Counts 18–23 were originally brought on behalf of classes defined to include all franchised automobile dealers. In my bench decision of November 7, 1973 I ruled that plaintiffs could not represent these franchised dealers. The question remains as to whether Nabcor and its franchisees have any valid causes of action based on the destination charges made by the manufacturers to the dealers.

■ The manufacturer defendants contend that it is clear beyond any triable issue of fact that, to the extent that any destination overcharges were paid by Nabcor and its franchisees (as part of the prices paid to the franchised dealers), such overcharges were entirely passed on to Nabcor's customers. Defendants are clearly correct on this point.

Plaintiffs have now conceded that, with a few exceptions which can be eliminated on the ground of insubstantiality, Nabcor and its franchisees transact their business on a pure cost-plus basis. That is, they pass on to their customers the entire cost which Nabcor pays to the dealers, and add a fixed commission or brokerage fee constituting compensation to the Nabcor organization. Under these circumstances Nabcor and its franchisees have no valid antitrust cause of action for the alleged overcharges. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Obron v. Union Camp · Corp., 355 F.Supp. 902 (E.D.Mich.1972), aff'd, 477 F.2d 542 (6th Cir. 1973); West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied, 404 U. S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

This passing-on defense requires the granting of the summary judgment motions to dismiss Counts 18–20 and 23, except for Nabcor's transshipment claim in Counts 18–20.

■ Summary judgment should also be granted dismissing Count 21 in its entirety. This is a Robinson-Patman Act claim alleging discrimination against certain franchised auto dealers in favor of other franchised auto dealers. Such a claim clearly cannot be maintained by Nabcor and its franchisees, and I would not interpret Count 21 even to so allege.

Plaintiffs have conceded that Count 22 does not state a valid claim under Section 3 of the Clayton Act. They consent to summary judgment on Count 22 as now stated, but indicate that they wish to amend to assert the claim under Section 1 of the Sherman Act. No such leave to amend will be granted. If plaintiffs were to assert Count 22 under the Sherman Act, this would simply bring it within the ambit of Counts 18–20, which have already been disposed of as described above.

*Recapitulation of Summary Judgment Rulings*

The motions of the auto manufacturer defendants for summary judgment are granted to the following extent:

(1) Counts 21, 22, 23 and 27 are dismissed in their entirety.

(2) Counts 18–20 are dismissed, except as to the transshipment claim of Nabcor.

(3) Counts 14–17, 24–26 are dismissed as to plaintiffs Courtesy Auto Brokers, Heim, Jamele and Young.

Except as thus granted, the motions for summary judgment are denied.

*Class Action Motion*

The remaining question to be dealt with is whether plaintiffs can maintain

this as a class action on behalf of the alleged class of Nabcor broker franchisees. The complaint alleges that from 1966 to the time this action was commenced in December 1970, a total of about 200 Nabcor franchises were granted, of which 70 were still active.[3] An affidavit filed by plaintiffs on their class action motion asserts that the total number of franchises granted was about 250.

The only counts of the complaint now open for consideration regarding class action treatment are Counts 1–7 of the complaint. On November 23, 1973 I dismissed Count 8 of the complaint. As already described, Counts 9–13 have been severed. Moreover, the effect of my rulings in the earlier part of the present opinion is to preclude class claims on behalf of any absent broker-franchisees on Counts 14–27 of the complaint. Certain of these counts were dismissed in their entirety. As to the remainder of these counts not dismissed in their entirety, such remaining counts have been dismissed as to those plaintiffs who have acted merely as brokers and have not made any actual purchases of automobiles. Plaintiffs do not claim that any absent members of the broker-franchisee class made any actual purchases of automobiles, as distinct from being mere brokers. Thus there is no basis for asserting any of Counts 14–27 on behalf of any absent members of the alleged broker-franchisee class.

Counts 1–3 of the complaint allege that Ford, General Motors, various franchised dealers of each, and various newspapers and financial institutions engaged in illegal activities designed to injure the business of Nabcor and its franchisees and to prevent them from effectively competing with regular franchised dealers of General Motors and Ford. Counts 1–3 are brought respectively under Sections 1–3 of the Sherman Act.

Count 4 alleges that General Motors and Ford undertook certain acquisitions of auto dealers in violation of Section 7 of the Clayton Act.

Counts 5–7 are directed against all four auto manufacturers, General Motors, Ford, Chrysler and American Motors. These counts are based respectively on Sections 1–3 of the Sherman Act. They allege that each of the auto manufacturers makes available to its franchised dealers a warranty program, under which the dealers could perform warranty repair work on new cars and be paid for the labor and parts involved. It is alleged that such warranty programs have not been made available to Nabcor.

Counts 5–7 are indeed puzzling, in view of the fact that other allegations in the complaint, and numerous publicity statements of Nabcor, emphatically disown Nabcor's intention of setting up facilities to do warranty or any other repair work.

It is undoubtedly true, as defendants have stated, that the chief focus of plaintiffs' case is their claim that General Motors and Ford and others have conspired to boycott Nabcor and its franchised brokers (Memorandum of June 29, 1973 p. 1). This is the claim embodied in Counts 1–3 of the complaint.

As an initial proposition, it would seem desirable to permit the claims of Nabcor and its franchisees regarding the boycott against them to be handled on a class basis. One might suppose that there would be a central core of common issues as to whether there was a conspiracy to put Nabcor and its brokers out of business. A class action would permit a single trial of these common issues. Individual issues regarding injury and damage could be handled in an appropriate manner. See Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969).

I should here note that the propriety of class action treatment must

---

3. A Nabcor offering circular of April 29, 1971 defined an "active" franchisee as one who had sold at least one new automobile during the preceding 12 months.

be judged according to whether the action meets the requirements of Subdivision (b)(3) of F.R.Civ.P. 23. This subdivision provides for class action treatment in instances where questions of law or fact common to the members of the class predominate over any questions affecting only individual members.[4]

 I have come somewhat reluctantly to the conclusion that, for several reasons, class action treatment for the alleged broker-franchisee class is not appropriate. In the first place, there is grave doubt, to say the least, that there is a sufficient core of common issues on the counts of the complaint in question to justify class action treatment.

An analysis of the complaint indicates that plaintiffs are not really claiming a single central conspiracy, but a variety of conspiracies, mostly local in nature affecting individual Nabcor franchisees.

What is actually alleged is that, after the various Nabcor broker-franchisees started doing business, their customers began requesting warranty repair work from the regular auto dealers. It is alleged that the regular auto dealers did not look with favor upon performing warranty work on automobiles sold by Nabcor. The complaint alleges (par. 109):

"In light of these apparent difficulties for many franchised dealers, the unlawful conspiracy or combination developed, the Plaintiffs allege, to assist the franchised dealer in preserving the territorial exclusive of his franchise."

The complaint goes on to claim (par. 110) that local auto dealers would have power and influence with local banks, newspapers, better business bureaus, and motor vehicle bureaus. It is alleged that these auto dealers would use such influence to persuade the banks to refuse financing for Nabcor brokers and customers; to persuade the newspapers to refuse advertising to Nabcor brokers; to persuade better business bureaus to hinder the registration of automobiles sold through Nabcor brokers.

To be sure, the complaint alleges that the General Motors dealers enlisted the aid of General Motors, and the Ford dealers enlisted the aid of Ford, in order to assist the dealers in their anticompetitive activities. It is further alleged that both General Motors and Ford, and their top officers, took various actions to injure the business of the Nabcor organization. But the point remains that the complaint alleges a variety of local conspiracies, which may well be as important, or more important, than the alleged general conspiracies emanating from the headquarters of General Motors and Ford. It should be noted that there appears to be no contention of a conspiracy *between* General Motors and Ford.

 Defendants contend that predominant individual issues are presented on the issues of injury and quantum of damages with respect to each broker-franchisee. Both of these elements must be proved in a private antitrust damage action. 15 U.S.C. § 15; Winckler & Smith Citrus Prods. Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 n. 1 (9th Cir.), cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965); Carswell Trucks, Inc. v. International Harvester Co., 334 F.Supp. 1238 (S.D.N.Y. 1971).

If it were true that the present case involved only a claim of a single central conspiracy affecting all the broker-fran-

4. Plaintiffs cannot avoid the requirements of Subdivision (b)(3) of Rule 23 by placing it under the injunction provision of Subdivision (b)(2). It is true that plaintiffs ask for certain injunctive relief. But this does not avoid the necessity of considering the damage claims, which are certainly essential to the case, under Subdivision (b)(3). *See* Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 29–30 n. 9 (S.D.N.Y. 1972); 3B J. Moore, Federal Practice ¶ 23.-01 [10.–3] (2d ed. 1969). Nor is this an appropriate case under Subdivision (b)(1), which was designed for entirely different situations from what is presented here. *See* Advisory Committee Notes; 3B J. Moore, Federal Practice ¶ 23.35 [2] (2d ed. 1969).

chisees, then it is conceivable that a format might be worked out under Rule 23 for class treatment even of the individual issues, if there were a limited number of persons in the class, and if it could be foreseen that the individual issues would not involve undue amounts of depositions, trial witnesses, etc.

But the totality of circumstances in the present case makes it clear that we do not have such a situation. When we *combine* the scattered and diffuse nature of the alleged conspiracies with the nature of the individual issues regarding injury and damage, it becomes apparent that this action is not appropriate for class action treatment.

This is amply demonstrated by the discovery taken thus far respecting the claims of the named plaintiffs in the action. It should be noted at the outset that the "claims" as revealed in this discovery bear little resemblance to the claims as outlined in the complaint. The complaint is that Nabcor and its brokers were shut out from supplies of automobiles, and were prevented from obtaining advertising. It is also alleged that Nabcor customers were prevented from obtaining financing and warranty repair work, and were even hindered in having cars registered.

Plaintiff Courtesy Auto Brokers was in business as a Nabcor area broker from February until December 1968, during which time it participated in only one automobile transaction. Courtesy makes no claim of being denied automobiles, advertising or financing. Peter Cucci of Courtesy was called once by the Suffolk County District Attorney who asked about whether Courtesy was improperly operating without a license, and apparently concluded that it was not. Cucci has testified that Courtesy's going out of business had nothing to do with any action by General Motors, Ford or any franchised dealer.

Plaintiff Young was in business as a Nabcor broker, and then master broker, from May 1967 until he went bankrupt in March 1971, although he claims to have resumed some limited activity in September 1972. He made no attempt to buy cars directly from franchised dealers. He ordered automobiles from plaintiff General Auto Sales, and cites no instance of unfilled requests or orders. Young does not claim that he was ever denied advertising. He states that he was unable to obtain financing from two banks and a credit union, none of which is named as a defendant or co-conspirator. Young claims there were three or four instances where auto dealers refused, or refused temporarily, to perform warranty service on cars bought through Young. In one case, however, the work was done after Young communicated with a General Motors representative.

Plaintiff Heim was a Nabcor area broker from April 1969 until March 1970. Heim never engaged in a single automobile transaction. He never attempted to purchase cars from franchised dealers, and never ordered cars from Nabcor. He does not claim that he or his customers were denied any financing. Heim claims that the Allentown Call-Chronicle said at one time it would run no more advertisements for him until he furnished some information about Nabcor, which he did not provide. Nevertheless, later the Call-Chronicle ran an advertisement for him. Heim claims that the Easton Express refused advertising and asked Heim for information, which Heim did not give. The Allentown Call-Chronicle and the Easton Express were originally joined as defendants, but the action has now been discontinued as to them.

The other broker-plaintiffs—Nabcor East, General Auto Sales and Jamele— have perhaps attempted to assert somewhat more in the way of grievances. But it must still be said that their "claims", as set forth in the discovery, fall far short of what is alleged in the complaint. For instance, Jamele made no attempt to purchase automobiles from franchised dealers, and his only possible problem in obtaining cars through Nabcor was the delay in delivery of one Corvette. The claims of Nabcor East and

General Auto Sales about being deprived of cars are mainly made up of highly confusing and contradictory assertions about alleged problems with certain local dealers. There are a few claims by one or the other of plaintiffs Nabcor East, General Auto Sales and Jamele regarding mistreatment by local newspapers, financial institutions and motor vehicle officials.

Two points emerge. First, if the claims of the broker plaintiffs are typical of those of the other members of the broker-franchisee class, as they are supposed to be under Rule 23(a), one can only wonder about the utility of using the class action device to draw into litigation more of such "claims".[5]

The second point is that discovery has demonstrated that the claims of individual brokers, to the extent they raise litigable issues at all, involve basically individual, local issues. In order to determine whether this or that problem with a local automobile dealer, a local newspaper, etc. was an illegal anti-competitive act, it would be necessary to uncover all the evidence relating to these individual transactions. Other very real issues in this case would relate to whether an individual broker's failure in business stemmed from illegal acts of the defendants, or from other factors such as the broker's own inadequacy, Nabcor's failure to perform on the franchise agreement, etc.

I therefore conclude that the requirements of Rule 23(b)(3) are not met. It appears that the common issues do not predominate over individual issues, and that a class action is not an appropriate or efficient device to be employed in this litigation.

■ Another reason for denying class action treatment is that I find that there is insufficient assurance that plaintiffs will fairly and adequately protect the interests of the class of broker-franchisees, as required by Rule 23(a).

The question presented now, with respect to representation of the alleged broker-franchisee class of 200 or 250 persons, is different from the question dealt with in my bench decision of November 7, 1973 denying class action treatment for an alleged class of 42,000 persons. The fact that plaintiffs do not have the requisite financial and other ability to represent 42,000 persons does not necessarily mean that plaintiffs lack the ability to represent the 200 or 250 alleged members of its own organization.

At the oral argument of this motion I indicated a tentative view that the latter question could be resolved by simply finding out, perhaps by a questionnaire, whether the Nabcor brokers do or do not wish to have plaintiffs represent them. Defendants oppose such a procedure, contending that it would not solve the real problems respecting class action treatment. I have concluded that defendants are correct.

It should be noted at this point that, although certain brokers are named as plaintiffs in the action, they cannot be considered realistically as representatives of absent members of the alleged broker-franchisee class. The attorney for plaintiffs is Nabcor's attorney. Thus the question regarding representation is whether Nabcor and its attorney can fairly represent the broker class.

Defendants argue that there are conflicts between Nabcor and its brokers which make it inappropriate for Nabcor to represent the alleged broker-franchisee class. These conflicts, according to defendants, arise from actual and potential claims by the brokers against Nabcor for fraud and breach of the franchise agreements. Sixteen lawsuits by brokers against Nabcor on such claims have actually been brought, and judgments against Nabcor have been obtained in at least three of these actions.

The claims are that Nabcor sold broker franchises for fees ranging from

---

5. It appears that at least some of the plaintiffs other than Nabcor were brought into this action by Nabcor without any real idea of what the complaint would assert on their behalf.

$2,500 to $50,500, on the basis of false representations that Nabcor had a nationwide advertising system for the benefit of its brokers; that Nabcor would completely train the new broker; that Nabcor had developed complete financing, insurance programs; and that the brokers were assured of extremely large profits. One was allegedly promised a "minimum first year profit of $384,000".

In order to understand these allegations of extravagant profits, it should be noted that Nabcor master brokers and area brokers were permitted to sell broker franchises to persons in their areas. For instance, Dale Strimple, the principal of plaintiff General Auto Sales, has testified that Nabcor told him that if he became a master broker he could sell 20 Nabcor broker franchises in each of 50 counties in New York for $5,000 apiece, thereby receiving $5,000,000 on an investment of only $25,000. Strimple says he was told he would earn $900,000 to $1 million a year.

Apparently the brokers who have actually joined as plaintiffs in this action do not claim fraud or breach of contract by Nabcor, and are willing to have Nabcor's attorney represent them. It is the privilege of plaintiff brokers to so determine.

But there is a somewhat different question when it comes to the representation of absent members of the alleged broker-franchisee class. Under Rule 23 (a) the *Court* must make a determination in the interest of such absent persons and in the interest of the orderly prosecution of the lawsuit.

I find that there are actual or potential conflicts between Nabcor and the members of the broker-franchisee class which fundamentally disable Nabcor and its attorney from representing this class. Sixteen lawsuits by brokers undoubtedly indicate problems involving a substantially larger number. Nor are the issues regarding fraud and breach of franchise agreements unrelated to the present case. One of the defenses most strongly asserted by defendants in this case is that, if the business of individual brokers went badly or failed, this was because the Nabcor business concept was basically faulty and because Nabcor failed, for various reasons unconnected with defendants, to deliver what it had promised to the brokers.

Nabcor has a strong interest in rebutting this defense, and, in a sense, this might seem to assure vigorous representation of the brokers. But Nabcor's interest is in part to *protect itself* from *claims by these brokers*. Perhaps the conflict between Nabcor and its brokers might lead Nabcor to be over-zealous, rather than under-zealous, in representing the brokers on particular phases of the case. But regardless of precisely how the conflict might affect the case, it is there, and in my view makes Nabcor's representation of the broker-class undesirable. *See* Carroll v. American Federation of Musicians, 372 F.2d 155, 162 (2d Cir. 1967), vacated on other grounds, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968); 3B J. Moore, Federal Practice ¶ 23.07 [3] (2d ed. 1969).

One final point to be dealt with regarding the adequacy of Nabcor's representation is Nabcor's financial condition. In 1971 Nabcor sold stock and debentures for net proceeds of $240,000. The offering circular dated April 29, 1971 stated that $50,000 of the proceeds would be used for the anti-trust litigation. The offering circular stated that Nabcor might not be able to obtain all the funds necessary to prosecute the litigation.

At a hearing on February 26, 1974 I questioned the attorney for Nabcor about Nabcor's ability to carry on a class action. He stated that Nabcor has proved its ability to conduct this litigation by doing so for over three years. In any event, according to Nabcor's attorney, Nabcor was not really having to support the litigation except to a limited degree, because there is a contingent arrangement for the attorney's fee, and the only legal expenses which Nabcor is

paying on a current basis are disbursements, which have amounted to about $4,000–$5,000.

There are several weaknesses in this argument. In the first place, Nabcor's record thus far in pursuing the action is not conclusive as to its ability to handle a class action, because the class action aspects of the litigation have not really begun.

More important, the statement about limited disbursements of $4,000–$5,000 is apparently incorrect. Nabcor's financial statement for the nine months ending October 31, 1971 stated that $20,600 had been spent on the present antitrust case. The record does not show what was spent between November 1, 1971 and January 31, 1972. Nabcor's statement for the six months from February 1, 1972 to July 31, 1972 showed that $9,390 was spent on the antitrust case and another action. A financial report prepared by defendants' accountants for the period August 1, 1972 to March 8, 1973 showed $7,600 for legal and accounting expenses.

The total of these figures is about $37,600. According to these reports Nabcor has spent far in excess of $4,000–$5,000 on the antitrust litigation.

The record also shows that Nabcor has been in weak financial condition for well over two years. For the nine months ending October 31, 1971 Nabcor had an operating loss of $82,000 on sales of $221,000—and a total loss, after extraordinary items, of $183,651. For the six months ending July 31, 1972 Nabcor had an operating loss of $87,000 and a total loss of $96,000 on sales of $216,000. As of July 31, 1972 Nabcor had a negative working capital balance of $212,000. As of March 8, 1973 Nabcor had a negative cash balance of $1,472.

Nabcor has not provided current figures. However, the record shows that a judgment for $150,000 was entered against Nabcor in December 1972 in an Ohio state court on a defaulted promissory note. This judgment came to light when certain defendants were served in November 1973 with an order of attachment issued by the Supreme Court, New York County.

Under all the circumstances I conclude that Nabcor and its attorney should not be permitted to represent any parties in this action beyond the plaintiffs who are now named in the complaint.

### Conclusion

The motions of the auto manufacturer defendants for summary judgment are granted to the following extent:

(1) Counts 21, 22, 23 and 27 are dismissed in their entirety.

(2) Counts 18–20 are dismissed, except as to the transshipment claim of Nabcor.

(3) Counts 14–17, 24–26 are dismissed as to plaintiffs Courtesy Auto Brokers, Heim, Jamele and Young.

Except as thus granted, the motions for summary judgment are denied.

Plaintiffs' motion to represent the class of Nabcor broker-franchisees is denied.

So ordered.